Argued January 13, affirmed January 27, 1960

# BROWN ET UX *v.* EAKINS

348 P. 2d 1116

*William Miller* argued the cause for appellant. On the brief were McCarty, Swindells, Miller & McLaughlin, Portland.

*Don S. Willner,* Portland, argued the cause for respondents. With him on the brief was G. Bernhard Fedde, Portland.

Before McALLISTER, Chief Justice, and WARNER, SLOAN and DUNCAN, Justices.

DUNCAN, J., (Pro Tempore)

In September, 1955, the parties made a contract whereby V. E. Eakins, doing business as Rose City Electric Co., defendant, undertook to install the electrical wiring in the house of plaintiffs, Clarence E. Brown and Mary Brown, husband and wife. Defendant performed the work in October, 1955. On November 7, 1955, the house was damaged by fire. Thereafter plaintiffs filed a complaint against defendant for damage resulting from the fire, alleging that defendant breached the contract by failing to install the wiring in a workmanlike manner, which failure proximately caused the fire and damage. Specifically, plaintiffs

alleged that the flames started from the electrical convenience outlet. A specification of failure to install good circuit breakers was not submitted to the jury and is not before this court.

On July 5, 1957, the jury returned a verdict of $2,956.16, and on July 9, 1957, judgment was entered for that amount, plus costs. Thereafter defendant moved for a judgment n.o.v., and in the alternative for a new trial. This was denied by order entered August 30, 1957.

■ The appeal presents two questions, the answers to which are found in the evidence. FIRST, was Willard Bliven, a witness for plaintiffs, qualified to testify on the cause of the fire? SECOND, was there sufficient evidence to warrant submission to the jury of the question of whether or not defendant performed in a workmanlike manner? This means doing the work in an ordinarily skilled manner as a skilled workman should do it. *Newlee v. Heyting,* 167 Or 288, 292, 117 P2d 829.

■ By the evidence it is shown that Bliven had 20 years' experience as an electrician. He now works for a contractor doing fire damage work and inspects jobs to make bids. It is not his duty to determine the cause of fires, but he was sometimes called upon to determine what caused fires, and he has seen about 200 fire jobs. He has talked to the Fire Inspection Bureau on various installations as to what caused the fires. His experience has been practical only, and he is not specifically trained for determining fire causes.

Bliven examined the Brown house wiring in April, 1956. Mrs. Brown testified that the outlet box in controversy and area surrounding were then in the same condition as immediately after the fire, except for removal from the box of plaintiffs' exhibit 12,

which is a short piece of copper wiring with an attachment. This exhibit is referred to as a terminal connection.

■ The evidence amply qualifies Bliven to give an opinion on the cause of fires generally and the cause of this particular fire.

■ V. E. Eakins, defendant, did not personally work on the job and went to the house only after the fire. He does not know if the wiring was finally approved by the State Electrical Division.

J. P. Schnell, employed by defendant, worked one day on the job, doing the roughing in. He installed the box for the outlet in question, but did not install the receptacle in the box. He did not return to this job.

L. S. Ringer, an employee of defendant, worked on the wiring after Schnell. Ringer installed the receptacle. To make the attachment he stripped the insulation from the wiring with a knife, which he said was the ordinary method. He stated that the job was installed according to "Code" and the material was "Underwriters-approved," but he did not know how many circuit breakers were installed. He was shown plaintiffs' exhibit 12, but could not tell if it had been nicked or damaged because, as he stated: "It has been very hot. You can't tell." He found that the insulation had been burned from the wire leading from the outlet box.

J. R. Himmelsbach, State Electrical Inspector with long electrical experience, was called by defendant. He inspected the job during the course of the work, but did not make a final inspection or render final approval of the job. He found some electrical cables placed under the ceiling joists instead of being run through holes bored in the joists and ordered a change

so as not to interfere with the ceiling installation. He went to the premises about December 19, 1955, but could not find the parts that were supposed to have caused the fire, and as he stated: "That upset any investigation I could make, because there wasn't anything for me to see * * *." He stated the job was at least average, with nothing about it from a workmanship standpoint to which he would "normally take exception." He was unable to satisfy himself that it was an electrical fire, but could not discount the fact that it could possibly have been. He did not believe the fire started from the electrical outlet.

John F. Pickett, Deputy Fire Marshal with long experience, testified by deposition for plaintiff. He went to the premises two days after the fire. He said that after a fire it is impossible to tell if the circuits are faulty. He could not determine the cause of the fire, but in his opinion the outlet box was the only place where the fire started, as this was the only place near the floor level that had a fire, and it travelled from the box up the wall to the attic. Plaintiffs' exhibit 6, a photograph of the area, supported this latter testimony. Pickett said a fire could start in an outlet box without an appliance being plugged in if a loose connection existed; that repeated vibrations such as from passing vehicles, jet planes, or such, with arcing (sustained luminous glow) could generate enough heat to start a fire either in the insulation or in the plywood wall. He said an overloaded circuit could produce the same result. He stated that the job had not been completed because on a finished job all joints are soldered, but he found some twisted joints in the boxes in the attic and ceiling of the kitchen.

Plaintiffs' exhibit 12 was found about December 1, 1955, in the bottom of the outlet box where the fire

allegedly started. Its removal was in the presence of several persons, including Mr. Fedde, attorney for plaintiffs, and James E. Lindquist. Bliven testified that this exhibit 12 was nicked near the point and had a bubble of copper at the end which burned the wire in two. He said the nicked wire should have been replaced or taped. Bliven testified on the cause of the fire as follows:

"THE WITNESS: My opinion the fire was caused by the fire that started in the outlet box from an installation that had been cut away from the wire so that the wire grounded out either to the side of the box or to the neutral wire, causing a short circuit which melted the end of the wire as is shown here in this exhibit.

"THE COURT: Can you determine all of this from your inspection of this, can you?

"THE WITNESS: That's right.

"THE COURT: Go ahead.

"THE WITNESS: It threw molten metal on this short circuit undoubtedly and some combustible material either in the box or in this wall—."

He testified to the presence of melted copper inside the box. The contention of defendant that the circuit breaker would have taken care of a short circuit was a jury question, but its effectiveness is doubted, in the light of the failure of the courtroom experiment testified to.

Defendant lays stress on Bliven's testimony that he was just speculating as to the cause. This arises from Bliven's cross-examination by Mr. Weinstein as follows:

"Q Mr. Bliven, you talked about a nick in the insulation, actually to short out any way, you would have to have that hot wire heading against the side

of the box so close there to that the resistance would cause an arc; isn't that true?

"A  Either the side of the box or the frame of the plug.

"Q  Either the side of the box or the frame of the plug?

"A  Or the neutral terminal.

"Q  Or the neutral terminal?

"A  Those three places.

"Q  Now, this Exhibit 12 was not within a very substantial distance of the terminal plug, was it, of the terminal connection, was it?

"A  It wasn't what?

"Q  Very substantial distance from the terminal connection, isn't it?

"A  Well, it is very close.  Two and a half or three inches.

"Q  What?

"A  Within two and a half or three inches.

"Q  If you took a wire like that that distance from that terminal post, that certainly wouldn't ground out there, would it?

"A  It did.

"Q  It wouldn't ground off the terminal post, would it there?

"A  You mean on the opposite side of the plug?

"Q  Yes.

"A  It very easily could, it is not too great of a distance over there.

"Q  Do you know whether this wire is in the same shape that it was?

"A  No.

"Q  You haven't any idea?  The other wire, as I recollect, it was fairly straight.

"Now, the suggestion is that this particular wire that is shown here grounded on the terminal connection attached to Exhibit 12 there?

"A  Very possible.

"Q You don't know, do you?

"A No.

"Q You are speculating, aren't you?

"A (Witness gestures.)

"Q Will you answer that question? You are just speculating?

"A Oh, yes, I am sorry. You wanted an answer."

Just what is meant by the foregoing questions and answers is not clear, but in any event it apparently relates to but one of the factors involved.

■ The evidence is found substantially sufficient to have warranted submission to the jury of the question of whether or not defendant failed to install the wiring in a workmanlike manner. The defendant's motion for directed verdict and judgment n.o.v. were properly denied. The judgment is affirmed.