[No. 699-2. Division Two. November 1, 1972.]

ELMO SPAHN et al., *Respondents*, v. PIERCE COUNTY MEDICAL BUREAU, INC., *Appellant*.

*Hugo Metzler, Jr.* (of *Metzler & Sauriol*), for appellant.

*Samuel L. Crippen,* for respondents.

PEARSON, J.—This is a suit by plaintiffs, Elmo and Irene Spahn, seeking to recover hospitalization costs under their "family coverage" contract with defendant, Pierce County Medical Bureau, Inc. From a judgment allowing plaintiffs partial recovery, defendant appeals. The facts are stipulated and we are presented primarily with a contract construction problem.

Mr. Spahn was a "subscriber" and Mrs. Spahn was an "eligible dependent" under the contract. Section 4 of the contract provided, in part:

The Bureau, acting under agency agreements with the following hospitals [which included Puget Sound General Hospital] which are herein referred to as "designated hospitals," agrees to pay said designated hospitals for the following services provided in hospitals to eligible dependents . . . *when such dependents are admitted as inpatients, and further provided that the patient must be solely under the care of participating physicians or surgeons of the Bureau.*

(Italics ours.)

On November 20, 1969, Mrs. Spahn suffered severe back pains while working at home and required immediate hospitalization. Her husband was unable to reach either of her two physicians, both of whom were "participating physicians" of defendant. Mr. Spahn then called Dr. Frank James from Kent, Washington, with whom he was acquainted, but who was not a "participating physician" of the bureau. Dr. James arranged Mrs. Spahn's hospitalization at Puget Sound General Hospital in Tacoma, and continued in attendance as her physician during the next 25 days until her discharge on December 15, 1969.

On December 3, 1969, Dr. James called in consultation an internal medicine specialist, Dr. Rodger S. Dille, who examined Mrs. Spahn at the hospital. Dr. Dille was a participating physician of the bureau. He diagnosed Mrs. Spahn's medical problem and recommended treatment. It is quite clear from Dr. Dille's testimony that the hospitalization was necessary from a medical standpoint. It is equally clear, however, that Mrs. Spahn did not thereafter become "solely under the care of" Dr. Dille, although Dr. James attempted unsuccessfully to have the hospital records changed. On December 11, 1969, this notation was made in the hospital records by Dr. James:

11 December, 1969 (1) Patient may be sent home when brace is delivered. (2) Change records to show Dr. Rodger Dille as attending physician. F. H. James, M.D.

Apparently, the brace was not delivered until December 15, 1969, and on that date Mrs. Spahn was discharged. Her hospital bill, which defendant refused to pay, amounted to $1,844.95.

Section 6 of the contract in question specifically covers a subscriber in the event an emergency occurs, necessitating hospitalization outside Pierce County—presumably where neither a designated hospital nor a participating physician would be available. There is no provision in the contract relating to a subscriber's need for emergency hospitalization within Pierce County where a participating physician might not be available. Section 4 provides the basic hospitalization coverage and neither covers nor excludes emergency hospitalization. Section 4 does not contain any per se geographic limitation on coverage.

The trial court determined that the contract was ambiguous and that it must be "strictly construed against the insurer." See 81 A.L.R.2d 928 (1962). The court determined, however, that Mrs. Spahn was required by the contract to place herself under the sole care of a participating physician "within a reasonable time." In its oral decision, the court stated:

> On December 3rd, Dr. Dille examined plaintiff and recommended to Dr. James that plaintiff be discharged when a brace was delivered. It seems unreasonable that such care could not have been provided before December 15th. The Court finds that by all reasonable standards, plaintiff by herself, or through Dr. James, should have placed herself under the care of her own doctor, or a participating physician, not later than December 5, 1969.

Accordingly, judgment was allowed in the sum of $1,332.85, covering the hospitalization from November 20, 1969 to December 5, 1969.

Defendant contends that the contract is not ambiguous, but explicitly requires the subscriber to be under the sole care of a participating physician where the hospitalization occurs within the county. It is argued that the court may not make a plain agreement ambiguous and then construe it in favor of the subscriber. *Hamilton Trucking Serv. v.*

*Automobile Ins. Co.,* 39 Wn.2d 688, 237 P.2d 781 (1951). Defendant concludes that the trial court erred in finding that the contract covered a portion of the 25 days' hospitalization.

■ The determination of whether a written contract is ambiguous and the resolution of any such ambiguity, absent a factual dispute, is a question of law for the court. *Murray v. Western Pac. Ins. Co.,* 2 Wn. App. 985, 472 P.2d 611 (1970). For the reasons stated below, we conclude that section 4 of the contract before us may be reasonably understood as having more than one meaning and, consequently, it is ambiguous. *Ladum v. Utility Cartage, Inc.,* 68 Wn.2d 109, 411 P.2d 868 (1966).

■ The first paragraph of section 4 conditions coverage on two criteria. First, a covered dependent must be admitted to a designated hospital as an inpatient, and second, the patient must be solely under the care of a participating physician. The ambiguity in section 4 revolves around the interpretation of these two conditions as they limit the scope of coverage afforded by the section. The source of the ambiguity is the failure of the contract to specify *when* the patient must come solely under the care of a participating physician. Because of the contract's failure to clearly define the temporal relationship between the two conditions, the scope of the hospitalization coverage may be interpreted in three different ways. First, the two provisions could be read to provide that the patient must be solely under the care of a bureau physician from the time of admission through the time of discharge, as a condition precedent to bureau liability. Second, the two provisions could be read to provide that the contract covered only those periods of time when the two conditions were concurrently satisfied. Finally, the two provisions could be read to provide coverage from the time of admission regardless of whether a bureau physician was then in attendance, but continued coverage would depend on the patient placing himself solely under the care of a participating doctor. Since the contract does not fix the time when the second requirement

must be complied with, this court will presume that the parties intended a reasonable time. *Smith v. Smith,* 4 Wn. App. 608, 484 P.2d 409 (1971).

Of the three interpretations, we think that the third should be adopted. We hold that section 4 provides coverage from the time of admission regardless of whether a bureau physician is in attendance, but terminates if the patient does not place himself solely under the care of a participating physician within a reasonable time.

■ This construction assigns equal significance to each of the two conditions, and best gives effect to all the language of each. Such an interpretation is to be preferred over one that restricts the operative effect of some language in the writing. *Newsom v. Miller,* 42 Wn.2d 727, 258 P.2d 812 (1953). The contract, at least in express language, does not require that a covered dependent be admitted by a bureau member. The patient need only be admitted. Moreover, he may be admitted by himself or by a nonparticipating physician without per se loss of coverage. If the first interpretation were adopted, however, the result would virtually compel the patient to be admitted by a bureau member. Likewise, if the second interpretation were adopted, the patient would be compelled to be admitted by a participating physician in order to obtain the fullest possible coverage. The third construction, on the other hand, initiates coverage "when such dependents are admitted as inpatients," and conditions full coverage on timely compliance with the other requirement.

There is another reason for selecting the third interpretation that relates to the scope of emergency hospitalization coverage available under the contract. There is no language in section 4 that limits contract benefits to "routine" or "planned" hospitalizations, nor can we find any language that can be so construed. Similarly, section 4 does not contain any per se geographic limitation. On the contrary, section 6 is quite specific and only covers emergencies that arise outside Pierce County. We think these differences between the two sections are significant and mean that

section 4 and 6 were never intended to be read together. That is not to say that the coverages afforded by the separate sections may not complement one another or even overlap. It does mean, however, that the subscriber must satisfy one or both of the two different sets of conditions in order to qualify for the contract benefits. Section 4, standing alone, can only be reasonably interpreted to mean that so long as the patient complies with the conditions within that section, hospital costs are covered regardless of where the injury arose or what the circumstances were that gave rise to the need for hospital care. The effect of selecting the first or second construction would be to condition coverage on the circumstances incident to the hospitalization, the happenstance of the patient's consciousness, his ability to choose a bureau physician, the availability of such doctors, and other factors not stated expressly in the contract. If the bureau intended to exclude emergency hospitalizations arising in Pierce County, the contract should have been explicit in this regard.

 The only question remaining is whether the circumstances of Mrs. Spahn's stay were within the scope of coverage afforded by section 4. At the outset, we note that this is not a case where a subscriber is attempting to qualify for contract benefits when the hospitalization was completely unnecessary. Dr. Dille, a participating physician, testified to the necessity of hospital care and the bureau has stipulated to Mrs. Spahn's need for an emergency hospitalization. Mrs. Spahn, however, was under a contractual duty to place herself solely under the care of a participating physician within a reasonable time after admission. This she failed to do. What constitutes a reasonable time is a question of fact dependent on the subject matter of the contract, the situation of the parties, their intention, and the circumstances attending performance. *Smith v. Smith, supra.* In view of the fact that Dr. Dille was consulted on December 3, 1969, and testified that Mrs. Spahn's stay up to that point was necessary and that further hospitalization

was required, we do not think that the trial court erred in fixing December 5, 1969 as a reasonable time.

The defendant argues strenuously that the trial court's interpretation is erroneous and that the only emergency hospitalization coverage available under the contract is provided in section 6 for illness or accidental injury arising outside the county. Section 4 provides, however, "The Bureau shall not be responsible for *inability to furnish* hospital care created by *emergencies,* lack of facilities, or other causes beyond the control of the Bureau." (Italics ours.) This disclaimer contemplates a limitation of bureau liability only if hospital care is unavailable during an emergency. In the facts before us, the emergency hospital care was available; it was the services of a participating physician that the subscriber could not obtain. In view of this express language, we cannot accept defendant's argument. We reiterate that section 4 must be interpreted to provide hospitalization coverage regardless of the circumstances that gave rise to the need.

Defendant also contends that this construction is contrary to the purpose of the second condition. The trial court found as fact and that fact is stipulated on appeal, that the purpose of requiring the patient to be under the sole care of a participating physician was to give the bureau some safeguard against both unnecessary and unreasonably lengthy hospitalizations. The question, however, is not whether the defendant is entitled to this safeguard, but when the bureau is entitled to it, and what consequences flow from a subscriber's failure to comply with the condition. We think that the interpretation adopted best gives effect to both conditions.

■ Finally, defendant argues that December 5 was arbitrarily chosen, and in any event was well beyond a "reasonable time" after the initial hospitalization. We disagree. We do not think that the contract required Mrs. Spahn to substitute a participating physician for Dr. James as soon as possible after her emergency admission. "As soon as possible" is not necessarily a "reasonable time." The record

shows that Mrs. Spahn was in considerable pain until after Dr. Dille examined her on December 3, 1969. The record also shows that it was Dr. Dille's examination that indicated the precise nature of her physical problems. We cannot say as a matter of law that the contract before us required Mrs. Spahn to substitute a doctor unfamiliar with her case for Dr. James, who had cared for her during the emergency period, at least while the cause of the emergency was not diagnosed. Such an interpretation, absent express language, would be unreasonable and would place an undue burden on the defendant's subscribers, who, through no fault of their own, are admitted and initially cared for by a non-bureau member at a time of crisis. As between two possible constructions, one of which would make the contract unreasonable and imprudent, and the other of which would make it reasonable, fair, and just, the latter interpretation will be adopted. *Dickson v. United States Fidelity & Guar. Co.*, 77 Wn.2d 785, 466 P.2d 515 (1970). We conclude that the record before us contains substantial evidence supporting the trial court's conclusion that Mrs. Spahn should have placed herself under the care of a bureau physician not later than December 5, 1969.

Judgment affirmed.

PETRIE, C.J., and ARMSTRONG, J., concur.