[No. 2983–2.   Division Two.   September 5, 1979.]

RALPH E. MCINTYRE, *Appellant,* v. FORT VANCOUVER PLYWOOD COMPANY, INC., *Respondent.*

*William C. Klein,* for appellant.

*James C. Hanken,* for respondent.

SOULE, J.—The plaintiff, Ralph E. McIntyre, appeals from a judgment dismissing his suit against Fort Vancouver Plywood Company, Inc. (hereinafter the Company) for breach of an employment contract. We affirm the dismissal.

The Company is a Washington business corporation which functions as a cooperative under its articles of incorporation and bylaws. In the spring of 1974, plaintiff applied to the Company and was approved for employment as a prospective shareholder. After successfully completing a probationary period, plaintiff was accepted for worker–shareholder status. He paid $26,500 for his stock in the Company. In February of 1975, he bid for, and was awarded, a position off–bearing veneer from the dryer. While in this position he was repeatedly admonished for his lack of effort and poor performance. He received two warning slips in May of 1975. They stated:

May 16, 1975. Reason for Warning: Unsatisfactory stacking of dry veneer on dry belt.
May 29, 1975. Reason for Warning: Incapable of off–bearing dry belt. Being removed from job.

Both "pink slips" stated "3rd Warning Subject to Reprimand." Following the second slip, McIntyre was removed from his bid job and assigned to feeding veneer into the dryer. While in that position, he was further admonished for lack of effort and poor performance, including his performance on cleanup assignments. In November of 1975, McIntyre was assigned to offbearing clipped veneer. For 3 days he was admonished by his foreman for lack of effort. On the third day he received his third warning slip which stated:

Nov. 6, 1975. Reason for Warning: "encapable [sic] of offbearing 8' green chain. Putting forth little effort. Being referred to Board of directors. Off work until decission [sic] of Board.

Plaintiff was suspended from work. On November 11, 1975, the Board met and heard recommendations by two supervisors to terminate McIntyre. After interviewing McIntyre and considering the matter, the Board removed him from worker–shareholder status.

For the purposes of this decision we assume the validity of plaintiff's theory that because of the nature of the

employment relationship, it was not terminable at will or without cause and that defendant had the burden of proving breach or failure of a condition of the employment contract. *Morris v. Rosenberg,* 64 Wn.2d 404, 391 P.2d 975 (1964). *Cf. State ex rel. Schoblom v. Anacortes Veneer, Inc.,* 42 Wn.2d 338, 255 P.2d 379 (1953).

Plaintiff assigns 10 errors to the proceedings in the trial court, but there are only three basic issues: (1) whether McIntyre "refused" to work as that term is used in the Company's bylaw 21 and work rule 13.5; (2) whether he received fair notice of the lack of effort for which he was terminated; and (3) whether proper grounds for termination existed independently of the grounds set forth in the Company's bylaws and work rules.

Before proceeding to the issues as we see them, we wish to comment on the scope of our review as it is affected by the content of the assignments of error.

██ ██ No single finding of fact is assigned as error and separately identified and set forth as required by RAP 10.3(g) and 10.4(c). Therefore, the findings are accepted as verities.[1] *Bignold v. King County,* 65 Wn.2d 817, 399 P.2d 611 (1965). The issues on review are therefore limited to whether the findings support the conclusions of law. *Browning v. Browning,* 46 Wn.2d 538, 283 P.2d 125 (1955). Further, assignment of error No. 1 challenges conclusions of law Nos. 2, 3, 4 and 5, together with the judgment of dismissal as derived from the trial court's memorandum opinion. An assignment of error directed to a memorandum opinion is not a proper assignment of error. *Sorrel v. Haight,* 71 Wn.2d 390, 429 P.2d 212 (1967). An assignment directed to a conclusion of law does not bring up for review the facts upon which it is founded. *Becwar v. Bear,* 41 Wn.2d 37, 246 P.2d 1110 (1952).

---

[1]Findings of fact Nos. 7, 8 and 9 expressly refer to repeated admonitions for lack of effort as well as to poor quality of job performance.

REFUSAL TO WORK

Bylaw 21 of the shareholder's manual issued by the Company provides:

The board of directors at any regular or special meeting shall have the power by a majority vote to remove from working status any shareholder–worker whom they shall find to be physically or mentally unfit for such work, or *who refuses to do his work* as outlined by the management.

(Italics ours.) Work rule 13.5 provides:

Any worker *who refuses to perform his job* as outlined by the foreman, superintendent, or management *shall be given by the superintendent one week off work for the first offense,* two weeks off work for the second offense, and one month off for the third offense.

(Italics ours.)

Plaintiff's basic contention is that his inactivity did not constitute refusal to work under bylaw 21, and alternatively, if it did constitute refusal, the Company failed to follow the procedure of graduated penalties set forth in work rule 13.5 for employees who refuse to work.

As to the first argument, plaintiff seems to discount anything but a verbal refusal to work. Under this interpretation, plaintiff could simply walk away from his job (which he did, according to the testimony of dryer supervisor Mark Johnson) without subjecting himself to sanctions for "refusal." Where one construction would make a contract unreasonable, and another equally consistent with the language would make it reasonable, the latter must be adopted. *Patterson v. Bixby,* 58 Wn.2d 454, 364 P.2d 10 (1961). *See also Spahn v. Pierce County Medical Bureau, Inc.,* 7 Wn. App. 718, 502 P.2d 1029 (1972). The more reasonable construction of "refusal" to work includes refusal by conduct, as in the present case. There is ample evidence in the record that plaintiff stood around idly, wandered away from his assigned tasks, and put an unfair burden on his fellow workers.

Joseph Creull, a shift foreman for the Company, testified as follows:

Q Calling your attention to Mr. McIntyre's work on off bearing the dry belt, did you form any opinion as to his effort and capacity as an employee for Fort Vancouver?
A Yes, I reprimanded Ralph.
Q Do you have an opinion?
A Yes.
Q What is your opinion?
A Well Ralph actually would not try to do the job he was capable of doing. But I don't believe he would try to do it. Many times the feeds were not to par—not up to standards.
Q Did you discuss this with Mr. McIntyre?
A I had many discussions with Ralph on that.

The time period of these discussions was from September of 1974 through May of 1975.

Myron Combelic, a shareholder and member of the Board of Directors, testified as follows:

Q Are you familiar with the events that led into the first warning slip?
A Yes I am.
Q Would you explain what happened?
A Somebody come to me and brought to my attention there was some real bad stacking being done on the dry belt. I should go take a look at that.
. . .
Q Were you familiar with the events that are involved in the second warning slip?
A Yes I am.
. . .
Q Just exactly what was taking place?
A If I may explain, the man up front is—if he doesn't have any wood to off bear, it's his responsibility to pull the wood into the different piles as a grader markman which gives a man behind a better chance to off bearing, getting it straight. So he was just kind of standing there watching the wood go by. And what he did stack was not straight.

As the witness expressed it:

Well, he never seemed to really put forth the effort. I kind of phrase [it] like he was never hungry. He didn't appear as really ever had to work for a living. He just kind of was drifting along taking things as they came.

Mark Johnson, the dryer tender, testified that McIntyre never did his share of the work on the dryers, and would wander away from clean–up jobs to which he was assigned.

Mike Ball, green end foreman, testified as follows:

Q Would you tell what took place that caused the issuance of the third warning slip?

A Well, he was placed on the 8–foot green chain during the three days. I observed his work habits and they were very poor. And I received numerous complaints from the other green chain workers. And so I told Mr. McIntyre two or three times he was going to have to improve, work harder, just show more initiative. The following two days I didn't see any initiative at all. The other four guys had to do all the work. And I had gone to the superintendent on a couple of times and asked him to come down and watch and see what kind of problems I had. So he did come down and observed his work habits a couple times before we decided on the pink slip.

Richard Grenier, Jr., superintendent, testified concerning the same incident:

Q Do you recall the third warning slip?

A Yes I do.

Q Okay, what happened at that time?

A Mike Ball had called me down to the green end to observe Mr. McIntyre, and which I did. Mr. Ball and I stood down there for a lengthy time. I asked Mr. Ball at that time to go over and have a talk with Mr. McIntyre.

Q Did he?

A Yes, he said he did.

Q While you were present, did you issue a pink slip at that time?

A The first time, no.

Q How much longer before—did you observe him a second time?

A Yes I did. Mr. Ball called me down again on the second time calling me down there. I watched him again at that time, is when I decided that the—to issue a third pink slip.

Q Why?

A Because he was just standing there and not doing anything. He wasn't trying.

The foregoing testimony is substantial evidence that plaintiff, by his conduct, "refused" to work under bylaw 21. Its existence sustains defendant's burden to demonstrate cause for the discharge. *Morris v. Rosenberg, supra.*

■■ As to the second prong of plaintiff's argument, it is uncontroverted that plaintiff was not penalized by graduated layoff periods pursuant to work rule 13.5 before termination. Plaintiff urges that he was entitled to be laid off as a warning. We disagree. In construing a contract, intent of the parties must be ascertained from the writing as a whole, and we assume that the work rules are a part of the employment contract. *See Neiffer v. Flaming,* 17 Wn. App. 443, 563 P.2d 1300 (1977); *James S. Black & Co. v. P & R Co.,* 12 Wn. App. 533, 530 P.2d 722 (1975). Each portion of an agreement should be construed to avoid ineffectiveness. *Patterson v. Bixby, supra.* Warning is the express purpose of work rule 13.11, authorizing issuance of pink slips. Punishment is the purpose indicated by a reading of 13.5 with the other layoff sections surrounding it. To give each section a distinct purpose and effect, we hold plaintiff was entitled to the warning slips he received pursuant to work rule 13.11, but he was not entitled to be laid off as a warning under 13.5. That section simply grants foremen the authority to impose penalties. It may be analogized to statutes prescribing criminal penalties which may or may not be imposed by the court in the exercise of its discretion. *Cf. State v. Carlyle,* 19 Wn. App. 450, 576 P.2d 408 (1978).

The word "shall" upon which plaintiff relies, is not necessarily mandatory. It is mandatory where used, as in a statute, to confer a right or benefit. *See Snyder v. Cox,* 1 Wn. App. 457, 462 P.2d 573 (1969). However, the receiving

of a layoff is normally not considered by the recipient to be a benefit any more than is the receipt of a penalty authorized by the criminal law considered a benefit by the one who is sent to prison. More appropriate to the interpretation of work rule 13.5 is the reasoning of *In re Elliott,* 74 Wn.2d 600, 446 P.2d 347 (1968), where in discussing the word "shall" as used in the statute, the court quoted with approval from 82 C.J.S. *Statutes* § 380, at 881 (1953):

> Where a statute makes that legal and possible which otherwise there would be no authority to do, it will be construed as permissive only, although using the word "shall."

The same principle is applicable to the corporate instruments here involved. We view work rule 13.5 as a grant of authority to the foreman, not the extension of a benefit to the workman.

### NOTICE OF REASONS FOR TERMINATION

Work rule 13.11 provides that warning slips

> *shall* inform the offender of the nature of his unsatisfactory work or misconduct and that his job performance or course of conduct must promptly satisfy normal requirements or he will be removed from the job.

(Italics ours.)

Plaintiff contends that he was not given proper notice of the reason for his termination—lack of effort—until the third warning slip. It is true that the first two warning slips said nothing about lack of effort. But plaintiff conceded in his own testimony that he received oral notice as follows:

Q What did Mr. Grenier tell you his reasons were for the second pink or the second warning slip dated May 29th?

A He said, "we have been watching you for the past six months. You are hard on your co-workers and partners. You don't do your share of work."

The record further shows that Mark Johnson and Mike Ball expressed their dissatisfaction with his slackness to plaintiff repeatedly prior to issuance of the third warning slip and Joseph Cruell did so even before the first slip was

issued. We note that at the termination hearing, plaintiff did not claim lack of notice concerning his efforts. He merely claimed that he could not improve because he was already working to the best of his ability.[2] There is ample evidence that plaintiff had sufficient prior warning of the lack of effort which resulted in his termination.

### INDEPENDENT GROUNDS FOR TERMINATION

■ Regardless of what constitutes "refusal" to work under bylaw 21, implied grounds for termination have long been recognized to exist independently of any employment contract. Employees have an implied obligation to properly perform their work. *See Lynch v. Higley,* 8 Wn. App. 903, 510 P.2d 663 (1973); *George v. Goldman,* 333 Mass. 496, 131 N.E.2d 772 (1956); *Brown v. Eakins,* 220 Ore. 122, 348 P.2d 1116 (1960). We hold that on the evidence here, regardless of the express terms of the work rules and bylaws, that plaintiff had an obligation to put forth a reasonable amount of physical effort and that he persistently failed to do so. An employee's neglect of duty of a substantial character or misconduct which might injuriously affect the employer's business regardless of an express agreement

---

[2] Plaintiff's attitude during the final meeting can be gathered from the testimony of Walt Huttula, one of the directors:

Q . . . do you recall any specific conversations that took place during that meeting?

. . .

A . . . there was one specific one that was asked: "Do you feel that you could do a better job down there in the operation?" And his answer, as I recall it was, no, that he was doing the best he could. So that was a determining factor in my decision.

Q Would you explain how that—you reached that conclusion?

. . .

A All right, I felt in my own mind that if he had come back and said that he would go in there and try to put every effort into it, that my what [sic] would have been in favor of giving him another chance. But when an individual says that he has done all he could and by our rules and by the supervision's [sic] recommendations, no I couldn't go along with giving him another chance.

The witness' own observation of plaintiff's work effort was based in part on watching him on clean-up duty. "I observed that he would be leaning on the broom watching the rest of the people . . ."

on the subject, constitutes good grounds for discharging the employee. *Thomas v. Beaver Dam Mfg. Co.,* 157 Wis. 427, 147 N.W. 364 (1914). *See also* 100 A.L.R. 507 (1935). Therefore, we hold that termination of plaintiff was justified because of plaintiff's breach of his implied duty to exert a reasonable amount of physical effort as well as breach of his express duty to do his work as outlined by the management.

We affirm.

PEARSON, C.J., and REED, J., concur.