Argued and submitted January 8, 1999, sentence of death vacated, and case remanded to circuit court for further proceedings May 4, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## DAYTON LEROY ROGERS,
*Appellant.*

(CC 88-355, 88-356, 88-357, 88-358,
88-359, 88-360; SC S41392)

4 P3d 1261

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellant. With her on the briefs was Sally L. Avera, Public Defender, Salem.

Janet Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and David B. Thompson, Assistant Attorney General. Robert B. Rocklin, Assistant Attorney General, Salem, filed a supplemental brief for respondent.

Before Carson, Chief Justice, Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.*

DURHAM, J.

---

* Kulongoski, J., did not participate in the consideration or decision of this case.

## DURHAM, J.

Defendant appeals from a judgment that imposed a sentence of death following his conviction on 13 counts of aggravated murder. The judgment is subject to automatic review in this court. *Former* ORS 163.150(1)(g), *repealed by* Or Laws 1999, ch 1055, § 1.[1] For the reasons that follow, we vacate the sentence of death and remand this case to the circuit court for further penalty-phase proceedings.

Over a period of time in 1987, police discovered the bodies of seven women in the Mollala Forest. The State Medical Examiner determined that each of the women had been stabbed or cut with a sharp object. When the bodies were discovered, defendant was in police custody as a suspect in the killing of another woman, Smith. Smith had died from multiple stab wounds. Smith and the seven women buried in the Mollala Forest were prostitutes. The facts surrounding the Mollala Forest killings shared other similarities with those surrounding the Smith killing. During the investigation of the Molalla Forest killings, defendant was convicted of aggravated murder for killing Smith, but he was not sentenced to death.

In May 1989, defendant was found guilty of 13 counts of aggravated murder arising out of six of the Molalla Forest killings.[2] In June 1989, the court sentenced defendant to death. On automatic review, this court vacated the death sentence and remanded the case to the trial court for a new penalty-phase proceeding that would include the so-called "fourth question," as explained in *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990). *State v. Rogers*, 313 Or 356, 836 P2d 1308 (1992). In May 1994, after a new penalty-phase proceeding

---

[1] Judgments of conviction and sentences of death are now subject to automatic review in this court pursuant to ORS 138.012(1). The parties do not argue that that statutory change affects the analysis or disposition of this case.

[2] Defendant was charged in a separate indictment for each victim. In each indictment, he was charged with one count of aggravated murder in the course of torturing the victim, ORS 163.095(1)(e), and aggravated felony murder in the course of kidnapping, ORS 163.095(2)(d); ORS 163.115(1)(b)(E) and (F). In one indictment, defendant was charged with a third count of aggravated murder for murder in the course of sexual abuse. ORS 163.095(2)(d); ORS 163.115(1)(b)(H).

before a jury (the remand proceeding), the trial court again sentenced defendant to death.

## AVAILABILITY OF THE "TRUE-LIFE" SENTENCING OPTION

During the remand proceeding, the trial court refused to permit the jury, under ORS 163.150(5)(a) (1993) (quoted below), to consider the option of sentencing defendant to life in prison without the possibility of parole and to permit defendant to waive any objection, under the *ex post facto* provisions of the state and federal constitutions, to the jury's consideration of that option.[3] Defendant assigns error to that refusal.

When defendant committed his crimes, ORS 163.150 (1985) provided two sentencing options for aggravated murder: death or life in prison with a 30-year minimum (ordinary life). After the first penalty-phase proceeding, the legislature added a third option: life in prison with no possibility of parole (true life). During the remand proceeding, defendant submitted a "motion to accept defendant's waiver of *ex post facto* issue and to submit life without parole option to jury with appropriate instructions." The state opposed the motion, and the trial court refused to allow the jury to consider the true-life option.

Defendant argues that that refusal was erroneous for several reasons, including that criminal defendants may waive any *ex post facto* challenge. This court addressed a similar issue in *State v. McDonnell*, 329 Or 375, 987 P2d 486 (1999). In *McDonnell*, the defendant did not object, on an *ex post facto* ground or otherwise, to the retroactive application of the true-life sentencing option in his remand proceeding and filed a waiver of any *ex post facto* objection. The trial court nevertheless refused to apply ORS 163.150(5) (1993), which was in effect at the time of the remand proceeding, and instructed the jury only about the two sentencing options that were in effect when the defendant committed his crime.

---

[3] Article I, section 21, of the Oregon Constitution, provides, in part: "No *ex-post facto* law * * * shall ever be passed * * *." Article I, section 10, of the United States Constitution provides, in part: "No State shall * * * pass any * * * ex post facto Law * * *." For a discussion of the history of the Oregon *ex post facto* clause, see *State v. Cookman*, 324 Or 19, 25-31, 920 P2d 1086 (1996).

The defendant was sentenced to death. On review, this court concluded that the trial court erred in refusing to apply ORS 163.150(5) (1993), reasoning that the defendant was entitled to, and did, waive the constitutional protection against *ex post facto* laws by failing to assert a timely objection or to claim that a post-offense sentencing statute is an *ex post facto* law. 329 Or at 390, 392.

Defendant argues, as did the defendant in *McDonnell*, that he was entitled to have ORS 163.150(5) (1993) applied in his remand proceeding. This case, however, presents several variations on *McDonnell*. First, in this case, the state argues that the legislature did not intend ORS 163.150(5) (1993) to apply in this situation, because, according to the state, defendant's "trial[ ] commenc[ed]" before July 19, 1989. ORS 163.150(4) (1993). Second, in this case, unlike in *McDonnell*, the state objected to defendant's waiver of his *ex post facto* objections to the application to his remand proceeding of ORS 163.150(5) (1993). Third, the state contends that defendant's written motion to accept his waiver of his *ex post facto* objection was inadequate. For the reasons that follow, we hold that those arguments do not require a different result than in *McDonnell*.

■ The state first argues that the true-life option should not apply to defendant because, although the legislature intended that ORS 163.150 (1993) would apply retroactively, the legislature, in ORS 163.150(4) (1993), limited that retroactive application to remand proceedings in which the trial had commenced on or after July 19, 1989. The state argues that a "trial commences," for purposes of ORS 163.150(4) (1993), at the beginning of the first guilt-phase proceeding and, because defendant's first guilt-phase proceeding began in March 1989, the trial court had no authority to apply the true-life option to defendant.

Defendant responds that ORS 163.150(4) (1993) does not control here. Defendant contends that this court remanded his case for a new penalty-phase proceeding and that ORS 163.150(5) (1993) governs that remand proceeding. ORS 163.150(5)(a)(B) (1993) directs that all three sentencing options be available to the jury in remand proceedings. ORS 163.150(5)(e) (1993) provides that "[t]he provisions of this

section * * * shall apply to any defendant sentenced to death after December 6, 1984." According to defendant, ORS 163.150(5) (1993) evinces a legislative intention that defendants who are sentenced to death after December 6, 1984, have all three sentencing options available if their cases are remanded for new penalty-phase proceedings. Defendant further contends that, even if the effective date provision in ORS 163.150(4) (1993) applies here—meaning that the legislature intended the true-life option to be available to only those defendants whose trials commenced after July 29, 1989—a "trial commences" not only at the beginning of the first guilt-phase proceeding, but also at the beginning of a new penalty-phase proceeding after remand. According to defendant, because his penalty-phase proceeding after remand began in March 1994, he is among those persons to whom the court may apply the true-life option.

■　　As this court explained in *McDonnell*, before assessing whether a defendant may or did waive an *ex post facto* objection to the application of a post-offense statute, we must ascertain whether the legislature intended to adopt retrospective legislation that applies to the situation at hand. 329 Or at 382-83. In *McDonnell*, this court concluded that the legislature intended that all three sentencing options be available in remand proceedings in which a defendant had been sentenced to death after December 6, 1984. *Id.* at 383. In essence, the state contends that that conclusion was incorrect because, instead of looking to the effective date in ORS 163.150(5)(e) (1993), the court should have looked to the effective date in ORS 163.150(4) (1993), an argument that the defendant in *McDonnell* did not raise. Which provision governs is a question of statutory interpretation to which the methodology summarized in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), applies.

The relevant parts of ORS 163.150 (1993) provide:

"(1)(a)　Upon a finding that the defendant is guilty of aggravated murder, the court * * * shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment, as described in ORS 163.105(1)(c), life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), or death. * * *

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence.

"* * * * *

"(f) If the jury returns an affirmative finding on each issue considered under paragraph (b) of this subsection, the trial judge shall sentence the defendant to death.

"* * * * *

"(2)(a) Upon the conclusion of the presentation of the evidence, the court shall * * * instruct the jury that if it reaches a negative finding on any issue under subsection (1)(b) of this section, the trial court shall sentence the defendant to life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), unless 10 or more members of the jury further find that there are sufficient mitigating circumstances to warrant life imprisonment, in which case the trial court shall sentence the defendant to life imprisonment as described in ORS 163.105(1)(c).

"* * * * *

"(4) * * * *Subsection (2) of this section shall apply only to trials commencing on or after July 19, 1989.*

"(5) Notwithstanding subsection (1)(a) of this section, the following shall apply:

"(a) If a reviewing court finds prejudicial error in the sentencing proceeding only, the court may set aside the sentence of death and remand the case to the trial court. * * *

Upon remand and at the election of the state, the trial court shall * * *:

"* * * * *

"(B) Impanel a new sentencing jury for the purpose of conducting a new sentencing proceeding to determine if the defendant should be sentenced to:

"(i) Death;

"(ii) Imprisonment for life without the possibility of release or parole as provided in ORS 163.105(1)(b); or

"(iii) Imprisonment for life in the custody of the Department of Corrections as provided in ORS 163.105(1)(c).

"* * * * *

"(d) *The new sentencing proceeding shall be governed by the provisions of subsections (1) and (2) of this section.* * * *

"(e) *The provisions of this section* are procedural and *shall apply to any defendant sentenced to death after December 6, 1984.*"

(Emphasis added.)

The state argues that the statute that provides the application date here is ORS 163.150(4) (1993), which directs retroactive application to "trials commencing on or after July 19, 1989." The state contends that ORS 163.150(5) (1993) applies when a reviewing court finds prejudicial error in the sentencing proceeding only and remands the case to the trial court, as provided in ORS 163.150(5)(a) (1993). ORS 163.150(5)(d) (1993) directs that "[t]he new sentencing proceeding shall be governed by the provisions of subsections (1) and (2) of this section." According to the state, the legislature has expressed in ORS 163.150(5)(d) (1993) an intention that ORS 163.150(2) (1993) shall apply to remand proceedings. However, under ORS 163.150(4) (1993), ORS 163.150(2) (1993) applies "only to trials commencing on or after July 19, 1989." The state concludes that, because the application date of ORS 163.150*(2)* (1993) is July 19, 1989, and because ORS 163.150(2) (1993) applies to remand proceedings under ORS

163.150(5) (1993), the application date of ORS 163.150*(5)* (1993) also must be July 19, 1989.

■ That reasoning is unpersuasive. Although the legislature has expressed an intention that ORS 163.150*(2)* (1993) apply to remand proceedings, it did not express that intention regarding ORS 163.150*(4)* (1993). The legislature incorporated the July 19, 1989, application date in ORS 163.150(4) (1993), not in ORS 163.150(2) (1993). The legislature provided a specific application date for ORS 163.150(5) (1993) within that section. We may not insert what the legislature has omitted or omit what it has inserted. ORS 174.010; *PGE*, 317 Or at 611. The state's proposed construction would require both the insertion into ORS 163.150(5)(d) (1993) of a requirement that the new sentencing proceeding be governed by ORS 163.150(4) (1993) and the omission from ORS 163.150(5) (1993) of the application date that expressly applies to that section. By its terms, ORS 163.150(5)(e) (1993) makes the remand procedure in ORS 163.150(5)(a) (1993)— including all three sentencing options—applicable to "any defendant sentenced to death after December 6, 1984."[4] Unquestionably, defendant's case met that requirement because, at the time of the remand proceeding in 1994, the court had sentenced defendant to death after December 6, 1984. We conclude, in accordance with our reasoning in *McDonnell*, 329 Or at 385, that the legislature intended that ORS 163.150(5)(a) (1993) would apply to the remand proceeding in this case.

■ In *McDonnell*, this court held that the defendant's decision not to invoke the protection of the *ex post facto* clauses constituted a waiver of those constitutional protections and that his arguments to the trial court and his written waiver indicated that his decision not to invoke his constitutional protection against *ex post facto* laws was an intentional relinquishment of a known right. 329 Or at 389, 392. Similarly here, defendant intentionally decided not to invoke the protection of the *ex post facto* clauses. That decision constituted a waiver of the protection afforded by those clauses.

_____

[1] Our rationale obviates the need to address the parties' arguments about the meaning of the words "trials commencing" in ORS 163.150(4) (1993).

That the state objected to defendant's waiver in this case, whereas, in *McDonnell*, it did not, makes no difference to the result. As this court observed in *McDonnell*, the "claim [that application of ORS 163.150(5) (1993) violated the prohibition against *ex post facto* laws] was defendant's to assert, and he did not do so." 329 Or at 390. Any objection by the state to defendant's waiver of the protection of the *ex post facto* clauses has no effect. Because defendant did not invoke those constitutional protections in this case, he waived those protections.

The state also suggests that defendant's waiver was inadequate because, in his motion to accept his waiver, he did not mention that he was waiving the right to raise *ex post facto* challenges in post-conviction or federal habeas corpus proceedings or that he waived any challenge to the procedure that could lead to the imposition of a true-life sentence.

■ To be effective, a defendant's waiver of the protection of a pertinent statute or constitutional provision need not follow a set formula:

> " 'A waiver is an intentional relinquishment or abandonment of a known right or privilege.' *State v. Meyrick*, [313 Or 125, 132, 831 P2d 666 (1992)]. Although a waiver must be intentional, there is no particular formula for determining whether a waiver has occurred. 'Whether there has been an intentional relinquishment or abandonment of a known right or privilege will depend upon the particular circumstances of each case * * *.' *Ibid*."

*State v. Hunter*, 316 Or 192, 201, 850 P2d 366 (1993). In this case, defendant sufficiently indicated that he intentionally was relinquishing his known right to protection against *ex post facto* laws both in his written motion and in his arguments to the trial court during the hearing on that motion. We conclude that defendant waived his protection against *ex post facto* laws by choosing not to object to the application of ORS 163.150(5)(a) (1993) in the remand proceeding. The trial court erred in refusing to accept defendant's waiver.

■ The trial court's decision not to apply ORS 163.150(5)(a) (1993) in the remand proceeding was not harmless error. A properly instructed jury might have returned a

verdict supporting a sentence other than death. As a consequence, we must vacate the sentence of death and remand the case for further proceedings. *See McDonnell*, 329 Or at 392 (reaching same conclusion).

We turn to several other issues raised in defendant's appeal that are likely to recur on remand. *See, e.g., State v. Smith*, 310 Or 1, 22, 791 P2d 836 (1990) (following that methodology).

### RIGHT TO BE HEARD

In his second assignment of error, defendant contends that the trial court erred in limiting an unsworn statement that defendant desired to address to the court and the jury at the end of the penalty-phase proceeding. Before the remand proceeding, defendant moved for permission to make an unsworn statement to the jury after closing arguments. The state moved to require defendant to submit a copy of his proposed statement to the court so that the court could review the statement for relevancy before defendant delivered it to the jury. Defendant responded that any "prior restraint" of his "allocution" was improper. In particular, defendant contended that, under the "fourth question" in capital cases, the scope of permissible allocution is broad, and so it was unlikely that defendant's statement could stray into irrelevant topics.

After hearing arguments, the trial court ruled:

> "Well, my view is that the defendant's entitled to a statement. * * * [M]y concern is that by providing that opportunity after the conclusion of the evidence in the case and prior to the argument that there needs to be some submission to the Court about the contents of his statement. I think that provides a way that there is a structure, that I can satisfy myself won't result in error that would cause a mistrial and this process [to] have to be * * * repeated. * * *

> "* * * * *

> "Well, as I indicated, there would be a right of allocution. That would be exercised prior to the arguments of the case. There would be a submission in writing to the Court of the proposed statement. I think that provides the Court

with a safeguard on the relevancy and other matters. And I agree that it's a broad scope here but I think we need to know what's going to be submitted, particularly given the stage of the proceeding that it is made. * * *"

After the close of evidence, defendant submitted to the trial court the following proposed statement:

"Ladies & Gentlemen of the Jury—

"What I have done [and] caused clearly overshadows anything I can say here today. In no way do I nor can I justify a thing. It's true that there was a lot of abuse in my raising, but I don't blame my parents for what I've done and caused as an adult. There is never a day that I don't struggle within the very depths of my heart and soul over the horrible things I've done. Because of what I have done, I have literally sentenced the hearts of those family members to a lifetime of precious loss and grief. I have clearly proven to all [and] myself that I don't belong in the free community and never do.

"Besides the task before you in this case, I am currently serving a life sentence with a 30 year minimum from the previous Smith trial. And your Honor, at this time I respectfully appeal to you that should this jury spare my life, I ask that I be sentenced to consecutive life sentences."

The trial court struck the last paragraph in its entirety, but allowed defendant to read the remainder of his statement to the jury.

Defendant now argues that the trial court erred in three ways: (1) by requiring him to submit his proposed statement for the court's review; (2) by requiring him to read a statement to the jury instead of allowing him to speak extemporaneously; and (3) by editing his statement. Defendant contends that those limitations violated his rights under Article I, section 11, of the Oregon Constitution, and the Eighth and Fourteenth Amendments to the United States Constitution.[5] We first consider defendant's arguments

---

[5] Article I, section 11, of the Oregon Constitution, provides, in part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

The Eighth Amendment to the United States Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

under the Oregon Constitution. *See, e.g., State v. Charboneau*, 323 Or 38, 53, 913 P2d 308 (1996) (court considers state constitutional claims before federal constitutional claims); *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (the court must resolve all questions of state law before reaching federal constitutional arguments).

Defendant argues that Article I, section 11, provides criminal defendants with the right to make unsworn statements to the jury and that the sole permissible limitation on the content of that "allocution" is relevancy. He relies on *DeAngelo v. Schiedler*, 306 Or 91, 757 P2d 1355 (1988). Defendant further observes that the scope of relevancy in capital cases is particularly broad because, under the "fourth question," juries may consider, "as a mitigating factor, any aspect of a defendant's character * * * that the defendant proffers as a basis for a sentence less than death." *State v. Stevens*, 319 Or 573, 583, 879 P2d 162 (1994) (citation omitted; emphasis omitted). Thus, according to defendant, a defendant in a capital case is entitled "to speak to the jury in an unrestricted fashion because it is difficult to determine exactly what that jury would consider 'mitigating' in deciding a sentence of life or death." Defendant contends that, because nothing in his proposed statement was irrelevant, the trial court erred in striking the last paragraph. Defendant further argues that his extemporaneous feelings and thoughts constitute an aspect of his "character" from which the jury could have inferred that his life should have been spared and, accordingly, that the trial court erred in requiring him to read from a prepared statement.

The state first responds that the trial court satisfied the constitutional right to be heard by affording the opportunity for defendant to take the stand and offer sworn testimony subject to cross-examination. In giving defendant the opportunity to make an unsworn statement to the jury, the

The Eighth Amendment is made applicable to the states by the Fourteenth Amendment. *Robinson v. California*, 370 US 660, 667, 82 S Ct 1417, 8 L Ed 2d 758 (1962). The Fourteenth Amendment to the United States Constitution provides, in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]"

state argues, the trial court gave him more than the constitution requires and cannot be faulted for not giving him much more.

Defendant replies that the state conceded in the trial court that capital defendants have the right to make unsworn statements during the penalty phase and, accordingly, cannot assert a contrary position on appeal. The state denies making that concession and asserts that it conceded only that criminal defendants have a right of "allocution," which includes the right to take the stand and offer sworn testimony. The state submits that it might have acquiesced before the trial court to the view that an unsworn statement was *permissible*, but, according to the state, that position is distinguishable from conceding that defendant had a *right* to make an unsworn statement. The state contends that its position in the trial court is not inconsistent with its present argument. Furthermore, the state argues that, even if it did concede that capital defendants have the right to make unsworn statements to the jury, this court nevertheless may consider the state's challenge to that proposition in determining whether the trial court correctly limited defendant's statement, albeit for a reason that the trial court might not have considered.

■ We agree with the state that we can reach its present argument that criminal defendants have no right to make unsworn statements. When a trial court makes a ruling, we will affirm that ruling on appeal, even if the trial court's legal reasoning for the ruling was erroneous, if another legally correct reason and, to the extent necessary, the record developed in the trial court support the ruling. *See, e.g., State v. Montez*, 324 Or 343, 361, 927 P2d 64 (1996) (applying proposition); *Tarwater v. Cupp*, 304 Or 639, 644 n 5, 748 P2d 125 (1988) (on appeal, party seeking affirmance may change its argument and claim that lower court was right for the wrong reason). The "right for the wrong reason" principle establishes that appellate courts may examine legal arguments not relied on by a trial court to determine if those arguments provide a basis for affirmance. To conclude otherwise could result in reversal of a correct action of a trial court, which would warp the law and waste judicial resources. This court, quoting the Supreme Court of the United States, has stated:

> "[W]e do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.' * * * The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate."

*State v. Nielsen*, 316 Or 611, 629 n 12, 853 P2d 256 (1993) (citation omitted).

Furthermore, we find no support in the record for defendant's argument that the state conceded below that defendant had a right to make an unsworn statement. It appears that the state did not object in the trial court to allowing defendant to make an unsworn statement to the jury. However, defendant does not cite, and we cannot find, any concession by the state that defendant had a *right* to make an unsworn statement.

██ ██ Accordingly, we turn to the question whether defendant had a right to make an unsworn statement to the jury, apart from any right to take the stand and testify under oath. That question requires us to construe Article I, section 11, an original provision of the Oregon Constitution. This court has determined that "the right * * * to be heard by himself" in Article I, section 11, encompasses the right of all criminal defendants to allocution, which "refers to a convicted defendant's opportunity to speak before sentencing[.]" *DeAngelo*, 306 Or at 93 n 1. According to the state, however, *DeAngelo* leaves open the question of the form that allocution may take. The state is correct that *DeAngelo* does not resolve that issue directly.[6] Accordingly, we consider the specific

---

[6] The parameters of the right of allocution in Oregon is an open question. In *State v. Stevens*, 311 Or 119, 124, 806 P2d 92 (1991), this court stated that "Article I, section 11, grants two distinct, not overlapping, rights: *the defendant's right to make a statement and to testify*, and the defendant's right to be represented by counsel." (Emphasis added.) The issue in that case was whether Article I, section 11, entitled defendants to "hybrid representation," *i.e.*, whether defendants were entitled to perform the same duties as their lawyers. This court held that the right to be heard did not include the right to hybrid representation. *Id.* Because this court in *Stevens* was not concerned directly with whether Article I, section 11, encompassed the right to make an unsworn statement, any assertion on that point is *dictum*.

wording of Article I, section 11, the historical circumstances that led to its creation, and the case law surrounding it. *See Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992) (setting out methodology). Our goal is "to understand the wording in the light of the way [the] wording would have been understood and used by those who created the provision," *Vannatta v. Keisling*, 324 Or 514, 530, 931 P2d 770 (1997), and to apply faithfully the principles embodied in the Oregon Constitution to modern circumstances as those circumstances arise. *See, e.g., State v. Delgado*, 298 Or 395, 400-03, 692 P2d 610 (1984) (applying the principle embodied in the "right to bear arms" to weapons analogous to those in existence in 1859).

Article I, section 11, provides, in part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

In particular, in this case, we are concerned with what the framers of the Oregon Constitution meant when they provided that a criminal defendant has "the right to be heard by himself." The Oregon Constitution establishes that right in conjunction with the right to be heard by counsel. That suggests that the framers intended that the content of that right be similar to the right to be heard by counsel, *i.e.*, that a criminal defendant has the right to represent himself. Accordingly, the wording of Article I, section 11, supports defendant's view that he may present argument without taking the stand, similar to the way in which his counsel may make an unsworn closing statement to the factfinder.

---

Nor does *State ex rel Huddleston v. Sawyer*, 324 Or 597, 932 P2d 1145 (1997), resolve the issue. In that case, this court considered a facial challenge to ORS 137.700, adopted by the people as Measure 11 in 1994. This court concluded, among other things, that Measure 11 did not violate Article I, section 11. *Id.* at 611-12. Although the court discussed features of the right of allocution, it did not at that time address whether the Oregon Constitution allows a right to be heard that is distinct from the right to take the stand and testify. Similarly, *State v. Sally*, 41 Or 366, 70 P 396 (1902), is not dispositive. In that case, this court concluded that, *if* the common-law right of allocution applied to minor felonies—a holding that the court declined to make—then the trial court had complied substantially with that right in that case. *Id.* at 370-71.

We turn to the historical circumstances that led to the creation of Article I, section 11, and to the case law surrounding it. In this case, we address history and case law together, as our prior cases have explicated that history. Nothing in the reported history of the adoption of the Oregon Constitution sheds any light on the question of how the framers understood the right to be heard. Reports from the proceedings leading to the adoption of the Oregon Constitution are collected in Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* (1926). Insofar as the reports reflect, the wording at issue here was not discussed during the public deliberations of the constitutional convention. However, consideration of the historical legal context is illustrative.

In his special concurrence in *State v. Douglas*, 292 Or 516, 527-38, 641 P2d 561 (1982), Justice Lent provided a detailed history of the evolution of the right to be heard. He observed that the relevant wording of Article I, section 11, was copied from the Indiana Constitution of 1851, which, in turn, was drawn from the constitutions of Pennsylvania, Ohio, Tennessee, and Kentucky. *Id.* at 527. When those states adopted their constitutions, the right to be heard did not include the right to testify, because courts considered defendants in criminal trials to be incompetent to testify due to bias. *Id.* at 527-28. As indicated above, the available historical resources describing the adoption of the Oregon Constitution do not indicate that the framers had a view of the "right to be heard" different from the view that generally prevailed in 1859. On the contrary, the Bill of Rights in the Indiana Constitution was described during the Oregon constitutional convention as being "gold refined" and as "assert[ing] the civil rights of the citizens as ascertained in those 70 years of progress [since the United States Constitution was adopted]." Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* at 101-02.

At common law, criminal defendants, like all parties, were disabled from testifying under the reasoning that self-interest was likely to undermine their veracity. *Douglas*, 292 Or at 528-31 (Lent, J., specially concurring); *see also* Christopher D. Jaime, *Sword and Shield: An Analysis of*

*Criminal Defendants' Right To Be Heard Under Article I, Section 11, of the Oregon Constitution*, 28 Willamette L Rev 127, 129 (1991) (so stating). However, under the common-law system, courts allowed defendants to speak in their own defense, including presenting their own version of the facts, although they could not testify under oath. *Douglas*, 292 Or at 528-30 (Lent, J., specially concurring); Jaime, 28 Willamette L Rev at 129-30. Defendants also could examine and impeach witnesses and make legal arguments. *Douglas*, 292 Or at 530 (Lent, J., specially concurring); Jaime, 28 Willamette L Rev at 130. In addition, after a jury had returned a verdict of guilty against a defendant, courts would inquire whether the defendant knew of any reason why the court should not pronounce judgment. The courts allowed criminal defendants to make a responsive statement and labeled this process "allocution." Paul W. Barrett, *Allocution*, 9 Mo L Rev 115, 115 (1944).

That was the state of the law when the early state constitutions, upon which the Oregon Constitution was based, were adopted. Justice Lent opined that it was that common-law right to make unsworn statements that mid-nineteenth century Americans also had in mind when they included in their constitutions a right to be heard. *Douglas*, 292 Or at 532 (Lent, J., specially concurring). Justice Lent believed, and we agree, that the framers of the Oregon Constitution intended to incorporate into Article I, section 11, the contemporaneous understanding of the right of one criminally accused to be heard "by himself." *Id.*

As noted above, that contemporaneous understanding developed in a legal context in which a criminal defendant had no right to serve as a witness for or against oneself. *See* Revised Statutes of the Territory of Oregon, ch IV, title 1, §§ 3-4 (1854) (although court cannot prevent proffered witness from giving evidence by reason of witness's interest in action, that protection does not apply to a party to the action); *Latshaw v. Territory of Oregon*, 1 Or 141, 145-46 (1854) (where several defendants are indicted together, one cannot be a witness for the others). Because the constitutional right to be heard could not have encompassed, at the time of adoption, a right to make a sworn statement, that right must have entailed the right to make an unsworn statement.

The wording of Article I, section 11, and the prevailing understanding in 1859 that criminal defendants were disabled from testifying support the conclusion that the "right to be heard," at the time of the adoption of the Oregon Constitution, referred to a right to make an unsworn statement.

We next consider the parameters of that right, particularly with respect to the ways in which defendant contends that the trial court erred in constraining his right to be heard. Defendant challenges both procedural and substantive restrictions imposed by the trial court. We first address the procedural restrictions, *viz.*, the trial court's requirements that defendant read from a prepared statement and submit the statement to the trial court in advance for review.

It is well established that a trial court generally possesses broad discretion to control the proceedings before it. *See, e.g.*, ORS 1.010 (every court has power to regulate proceedings before it and to control, in furtherance of justice, conduct of persons connected with judicial proceedings); OEC 611(1) (court shall exercise reasonable control over presentation of evidence); *Still v. Benton*, 251 Or 463, 473, 445 P2d 492 (1968) (trial court has discretion and power to control progress of trial, including scope of recross examination); *State v. Barnett*, 251 Or 234, 237, 445 P2d 124 (1968) (scope of *voir dire* examination within trial court's discretionary power to conduct trial efficiently and expeditiously). For example, this court has concluded that trial courts have discretion to control arguments by counsel. *R.J. Frank Realty, Inc. v. Heuvel*, 284 Or 301, 306, 586 P2d 1123 (1978); *see also Biegler v. Kirby*, 281 Or 423, 426-27, 574 P2d 1127 (1978) (determination of how to allot argument between two attorneys arguing on behalf of one party is within discretion of trial court); *Amick v. Watson*, 280 Or 641, 645, 572 P2d 317 (1977) ("[T]he trial court is in the best position to evaluate the effect upon the jury of claimed prejudice because of an attorney's argument. Usually, these matters are left largely to the discretion of the trial court * * *."). Similarly, the trial court has the authority to exercise reasonable discretion regarding allocution by a defendant to ensure that the trial is orderly and

expeditious. Furthermore, especially in the case of statements by a defendant not made in response to questioning under oath, the trial court has a legitimate concern with assuring that the defendant does not make irrelevant or prejudicial statements. That concern, in fact, was the basis of the decision of the trial court in this case to require defendant to submit a written statement for the court's review and to read only that statement to the jury.

A trial court's authority to exercise reasonable discretion to ensure that the trial is orderly and expeditious does not evaporate when the parties assert their constitutional rights during trial. *See, e.g.*, *State v. Langley*, 314 Or 247, 257-60, 839 P2d 692 (1992) (rulings that implicated defendant's rights to counsel and to fair trial reviewed for abuse of discretion); *State v. Engeman*, 245 Or 209, 211, 420 P2d 389 (1966) (ruling that implicated defendant's right to fair trial reviewed for abuse of discretion). Rather, a trial court is obliged to accommodate the exercise of all pertinent constitutional and statutory rights by all parties within the context of an orderly and expeditious trial. *See State v. Burdge*, 295 Or 1, 14, 664 P2d 1076 (1983) (proposition that disqualification of testimony is too grave a sanction for unintentional violation of exclusion order represents "a practical and sensitive accommodation between a criminal defendant's right to present witnesses in his behalf and the court's need to control the trial proceedings"); *Still*, 251 Or at 474 ("Cross-examination is a matter of right, but the bounds of proper cross-examination are necessarily within the sound discretion of the trial judge, and this is particularly so when applied to recross-examination. It must be clear that counsel cannot be permitted to prolong the course of trial by continually returning to matters already considered or as to which he has been given ample opportunity to examine; otherwise, there would be no orderly procedure, and nothing but confusion.") (citation omitted). Nothing in the text of Article I, section 11, suggests that the framers intended that a defendant's right to be heard "by himself" should override the court's authority and responsibility to conduct the trial as an orderly and expeditious proceeding. The historical circumstances and case law surrounding Article I, section 11, support that reading. *See*

*Douglas*, 252 Or at 533, 533 n 17 (Lent, J., specially concurring) (from the colonial era on, a defendant's right to present a defense has been subject to some restrictions, *e.g.*, relevancy).

We conclude that, by requiring defendant to read from a prepared statement and to submit the statement in advance for review, the trial court acted within its discretion to ensure orderly and expeditious proceedings and to avert error. Defendant makes no convincing showing that those procedural restrictions prevented him from exercising fully his constitutional right to be heard. Therefore, as to those restrictions, we find no violation of defendant's right to be heard under Article I, section 11, of the Oregon Constitution.

Defendant next contends that those restrictions violated his rights under the United States Constitution, first pointing to the Due Process Clause of the Fourteenth Amendment. Defendant submits that, in *Green v. United States*, 365 US 301, 81 S Ct 653, 5 L Ed 2d 670 (1961), the Supreme Court recognized the "persuasiveness of a defendant speaking in his own words." He further argues that, under *Medina v. California*, 505 US 437, 112 S Ct 2572, 120 L Ed 2d 353 (1992), the denial of a defendant's opportunity to speak in an unedited, extemporaneous fashion " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' " 505 US at 445 (quoting *Patterson v. New York*, 432 US 197, 201-02, 97 S Ct 2319, 53 L Ed 2d 281 (1977)), and, therefore, that the trial court's procedural restrictions violated his right to due process. Defendant further contends that those restrictions violated his rights under the Eighth Amendment because, as explained in *Skipper v. South Carolina*, 476 US 1, 106 S Ct 1669, 90 L Ed 2d 1 (1986), and *Eddings v. Oklahoma*, 455 US 104, 102 S Ct 869, 71 L Ed 2d 1 (1982), a trial court must allow a capital jury to consider all relevant mitigating evidence, including aspects of a defendant's character. According to defendant, his extemporaneous, unedited thoughts are an aspect of his character, and, therefore, requiring him to read a preapproved written statement violated his Eighth Amendment rights.

The state responds that defendant has not shown that he could not have presented the same aspects of his character by taking the stand and testifying. The state contends that, because defendant chose not to pursue that available course, the court should not permit him to argue that he was prevented from presenting all relevant aspects of his character. The state further argues that there is no basis for defendant's federal constitutional arguments, because the United States Supreme Court has concluded that there is no federal constitutional right to allocution. The state relies for that argument on *McGautha v. California*, 402 US 183, 91 S Ct 1454, 28 L Ed 2d 711 (1971), and *Hill v. United States*, 368 US 424, 82 S Ct 468, 7 L Ed 2d 417 (1962).

We have reviewed the cases cited by the state and other cases, and it appears to us that the Supreme Court has not resolved definitively the questions of whether and to what extent the right of allocution may have a basis in the United States Constitution. Even if the United States Constitution requires an opportunity for allocution, however, we hold that that right was not violated in this case.

First, any due process interest served by allocution, as described by the Supreme Court, was satisfied here. The jury had the opportunity to hear defendant's arguments and evidence in the sound of his own voice. *See McGautha*, 402 US at 220 (ritual of allocution assures that a defendant will not be sentenced to death in silence). Furthermore, the Supreme Court has explained that constitutional rights are not absolute, but " 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' " *Rock v. Arkansas*, 483 US 44, 55, 107 S Ct 2704, 97 L Ed 2d 37 (1987) (quoting *Chambers v. Mississippi*, 410 US 284, 295, 93 S Ct 1038, 35 L Ed 2d 297 (1973)). *See also United States v. Scheffer*, 523 US 303, 308, 118 S Ct 1261, 140 L Ed 2d 413 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. * * * [S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are

designed to serve.") (internal quotation marks omitted; footnote omitted).

The trial court in this case imposed reasonable procedural limits on defendant's allocution based on its legitimate concerns about the criminal trial process. The trial court wanted to ensure that defendant's allocution would not introduce error at the end of a lengthy trial. The restrictions imposed were proportionate to accomplishing the objective of minimizing the risk of error. By requiring defendant to read from a prepared statement and to submit that statement in advance for the court's review, the trial court did not violate defendant's due process rights under the Fourteenth Amendment to the United States Constitution.

Second, the court's action did not infringe any Eighth Amendment interest that allocution implicates. In *Skipper*, 476 US 1, and *Eddings*, 455 US 104, the Court held that the exclusion of particular evidence violated the defendants' right not to have the death penalty imposed without "individualized consideration of mitigating factors" required by the Eighth and Fourteenth Amendments. *Eddings*, 455 US at 105 (citation omitted). Defendant contends that his "extemporaneous, unedited thoughts" are an aspect of his character such that the trial court was required to allow him to speak in an extemporaneous and unedited fashion. However, defendant does not explain what aspect of his character was excluded by the court's ruling that: (1) could bear on mitigation; and (2) defendant would have communicated to the jury had the court allowed him to speak free of any restraints. Nor does defendant demonstrate that any such aspect of his character was not communicated adequately by other means. We reject defendant's Eighth Amendment arguments without further discussion. We conclude that the procedural restrictions imposed on defendant's allocution did not violate his rights under the Fourteenth or Eighth Amendments to the United States Constitution.

We turn to defendant's argument that the trial court erred in restricting the substance of his unsworn statement by deleting the last paragraph, which read:

"Besides the task before you in this case, I am currently serving a life sentence with a 30 year minimum from the

previous Smith trial. And your Honor, at this time I respectfully appeal to you that should this jury spare my life, I ask that I be sentenced to consecutive life sentences."

According to defendant, allocution traditionally includes the right to discuss mitigating factors, and, because it is difficult to tell what a jury would consider mitigating, a defendant must be allowed to speak in an "unrestricted fashion."

The state responds that the trial court correctly struck those two sentences. The state contends that the second stricken sentence contained information that was inappropriate for allocution in two related ways: First, the state contends that the topic of consecutive sentencing was "a matter over which the jury has no say," and hence was outside the scope of proper allocution to the jury. Second, the state notes that the second sentence was addressed to the judge, who would control any consecutive sentencing decision, not to the jury, to whom defendant had asked to address his allocution.

When the Oregon Constitution was adopted, the permissible scope of a criminal defendant's unsworn presentencing statement included legal reasons why the court should not impose a potential sentence, general pleas for leniency, mitigating factors, and requests for pardon. Joseph Chitty, 1 *The Criminal Law*, 699 (4th ed 1841); Fred Cohen, *Sentencing, Probation, and the Rehabilitative Ideal: The View from Mempa v. Rhay*, 47 Tex L Rev 1, 9-10 (1968); *see also* Jaime, 28 Willamette L Rev at 132 (discussing trial in Virginia colony in 1766 in which a defendant exercised his allocution to persuade the court to accept his self-recommended sentence). This court has explained that allocution provides an opportunity for a defendant to convince the sentencing authority to impose no more than the minimum sentence and also allows the defendant to address other matters pertaining to the sentence. *Huddleston*, 324 Or at 612. As this court stated in *DeAngelo*:

> "The right to speak at a sentencing hearing should logically include the right to make any statements relevant to existing sentencing and parole practices. * * * Oregon's * * * approach to incarcerating individuals requires the sentencing judge to be fully informed of the defendant's

criminal history, the crime severity, and aggravating and mitigating matters * * *. [A] prime reason for allowing such a right is to provide the defendant an opportunity to plead for mitigation of the sentence. * * * [A] *defendant should be able to state any reason why he or she feels sentence should not be pronounced and, in addition to presenting mitigating evidence, be given an opportunity to make any relevant personal comments to the court.* This includes, but is not limited to, statements of remorse, apology, chagrin, or plans and hopes for the future. *Some defendants might even wish to plead for maximum punishment in an attempt to achieve some purported good.*"

306 Or at 95-96 (emphasis added).

■ Generally, of course, it is the court, not the jury, that resolves all sentencing issues. *See, e.g.*, ORS 137.010(1) (statutes defining offenses impose duty upon court to pass sentence in accordance with ORS chapter 137); ORS 137.120 (court shall impose sentence on persons convicted of felonies); ORS 161.615 (court shall fix the term of imprisonment for misdemeanors); ORS 161.725 (court may extend period of confinement of dangerous offenders). In capital cases, however, the legislature has dictated that both the court and the jury shall play significant roles in sentencing proceedings. *See* ORS 163.150 (setting out procedures for sentencing in capital cases). In this case, as distinguished from *DeAngelo*, we address for the first time the parameters of allocution in the context of a capital sentencing proceeding, in which both jury and court play a role. *See* ORS 163.150(1)(b) (in capital sentencing proceeding, jury must resolve four issues); ORS 163.150(1)(f), (2)(b) (depending on how jury resolves those four issues, court must impose a specified sentence).

■ We agree with the state that, in all cases, including capital cases, whether sentences are to be served consecutively or concurrently is a matter for the court, not for the jury. *See* ORS 137.123 (establishing criteria under which court may order sentences to run consecutively). This court has held that a trial court properly may refuse to allow a capital defendant's counsel to argue to the jury that the court could impose consecutive life sentences if the jury returned multiple life sentence verdicts. *State v. Williams*, 322 Or 620,

628, 912 P2d 364 (1996). This court reasoned that, to allow such an argument,

"would * * * open[ ] a Pandora's box involving all sorts of evidence and arguments about the possibilities of what the trial court might do, what the Parole Board might do, what the Governor might do, what might happen if defendant escaped, and so forth. A trial court has the authority to prevent the parties from arguing about matters outside the record and to prevent jury confusion and speculation about matters over which the jury has no say."

*Id.* at 628. The proposed statement in this case, however, is distinguishable and, as we explain below, when viewed in context, was relevant to issues that Oregon law required the jury, as well as the judge, to decide. ·

■ The pertinent sentences in defendant's statement were preceded by defendant's acknowledgment that "I have clearly proven to all [and] myself that I don't belong in the free community and never do." He then sought to inform the jury that he already was serving a sentence with a 30-year minimum. The state concedes that the subject of the first stricken sentence—that defendant already was serving a 30-year prison term for his conviction in "the Smith trial"—was within the record. One of the state's witnesses had testified that defendant already was serving a 30-year prison term, and the trial court had alluded to that prison term in the jury instructions, stating that any life sentence in this case "would commence on the completion of the life sentence currently being served by the defendant." The state's sole objection to the statement is that for defendant himself to mention his prison term in the Smith case after a prosecution witness already had mentioned it "could only have appeared to be self-serving."

■ We reject the state's argument. By referring to the prison term that he already was serving, defendant was attempting to obtain a less onerous sentence in this case. A primary traditional purpose for allocution is to allow a criminal defendant to plead for leniency or to establish mitigation. The fact that such a purpose is, by definition, "self-serving," may be accurate descriptively, but the label "self-serving" is not a useful analytical tool. By informing the

jury that he already would be in prison for many years, defendant was attempting to communicate a relevant mitigating consideration, *viz.*, the fact that he already was separated from the community for his conduct, and would continue to be for at least 30 years.

■ Two characteristics of the second stricken sentence satisfy us that that sentence also was within the proper scope of allocution. First, it invited the judge to impose consecutive life sentences but conditioned that request on the jury's acceptance of defendant's plea that it spare his life. Defendant sought to express that statement to the judge, but also in the jury's presence and for its benefit. The question whether a defendant might qualify for any sentence less than death is one that ORS 163.150(5) requires the jury to decide. By making the statement in question, defendant sought to demonstrate to the jury that a facet of his character—his willingness to accept lifetime imprisonment—should induce them to decline to sentence him to death.

Second, the second stricken sentence invited the trial judge to hold defendant to his word before the jury. By stating his condition before both the jury and the judge, defendant knew that he later would be unable to argue credibly against consecutive life sentences if the jury spared his life.

ORS 163.150(5) assigns unique roles to the jury and the judge, in that it makes both a part of the sentencing process. Thus, while defendant's second stricken sentence ordinarily would be pertinent to only the traditional sentencer, the judge, it had pertinence here to the jury, because under Oregon's death-penalty sentencing scheme, the jury is a participant in the sentencing decision. We conclude that both excluded sentences fell within the proper scope of allocution and that the court violated Article I, section 11, of the Oregon Constitution, in striking them from defendant's proposed unsworn statement.

## TESTIMONY OF DR. BLAKELY

■ During the remand proceeding, defendant called as an expert witness Dr. Blakely, a neuropsychologist. The state objected to Blakely's testimony on the ground that, because

he was not a neurologist, Blakely was not qualified to testify about possible causes of a frontal lobe dysfunction that he had detected in defendant's brain. The trial court sustained the objection. Defendant asserts that Blakely's education and experience qualified him to testify about possible causes of defendant's frontal lobe dysfunction and, accordingly, that the ruling was erroneous. As discussed below, we determine that we must review this assignment of error for errors of law. Applying that standard, we conclude that the court should have allowed Blakely to testify about the possible causes of defendant's frontal lobe dysfunction.

Blakely testified at length about an electroencephalogram (EEG), or record of brain waves, obtained during tests that Blakely had administered to defendant and about the results of that test. Blakely described the procedure itself and the meaning of different parts of the EEG. He testified that he had analyzed defendant's EEG and that it exhibited a characteristic pattern indicating frontal lobe dysfunction. Defendant then began to question Blakely about possible causes of frontal lobe dysfunction. The state objected, arguing that, because Blakely was not a neurologist, he was not qualified to render an opinion about possible causes of defendant's encephalographic profile. The trial court allowed defendant to make an offer of proof as to Blakely's qualifications. Among other things, Blakely explained that he and other neuropsychologists routinely render opinions interpreting clinical data and arriving at conclusions about possible etiologies to explain the data.

The trial court sustained the state's objection, stating, "[I]t seems to me that Dr. Blakely is able to testify as to his findings. To indicate a cause, I think is beyond his expertise." On appeal, defendant argues that Blakely was qualified, under OEC 702,[7] to testify about possible causes of frontal lobe dysfunction and that, accordingly, the trial court

_____

[7] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

erred in sustaining the state's objection on the basis that Blakely was not so qualified.

■■■ We first consider our standard of review. Defendant argues that the ruling in this case should be reviewed for errors of law, relying on several cases in which he contends that this court reviewed similar rulings for errors of law: *Mayor v. Dowsett*, 240 Or 196, 400 P2d 234 (1965); *State v. Stringer*, 292 Or 388, 639 P2d 1264 (1982); *Barrett v. Coast Range Plywood*, 294 Or 641, 661 P2d 926 (1983); *Dyer v. R.E. Christiansen Trucking, Inc.*, 318 Or 391, 868 P2d 1325 (1994). The state argues that the ruling should be reviewed for abuse of discretion, relying on cases in which it contends that this court applied that standard: *Myers v. Cessna Aircraft*, 275 Or 501, 553 P2d 355 (1976); *Stringer*, 292 Or 388; *State v. Carlson*, 311 Or 201, 808 P2d 1002 (1991). Both parties are partially correct, because the determination whether an expert witness is qualified to testify may involve both the application of legal rules and the exercise of a trial court's discretion. We conclude that we review the particular ruling at issue here for errors of law. We reach that conclusion because an examination of our previous cases shows that, although we have not stated it in so many words, our practice has been to review similar assignments of error for errors of law.

This court previously has explained that, with respect to many evidentiary decisions, trial courts possess broad discretion, as long as they exercise discretion within the range of legally permissible decisions. Put another way, if the application of a legal rule governing the admissibility of evidence allows for several legally correct outcomes, a trial court may exercise discretion to choose among those outcomes.

For example, in *Yundt v. D & D Bowl, Inc.*, 259 Or 247, 486 P2d 553 (1971), the plaintiff assigned error to the trial court's refusal to allow her expert witness, an architect, to testify. This court examined in depth the proper standard of review, explaining,

"Generally, when appellate courts speak of the discretion of a trial judge, they refer to an exclusive power of free

decision not revisable or reviewable by an appellate tribunal in the absence of abuse. * * *

"However, this cannot be the meaning of the term 'discretion' when a judge is faced with a decision whether to admit certain testimony of an expert after he has been deemed qualified. At this point, he must apply certain principles of law to his decision and he is not free of revision or review. In the case at bar, it was not singularly a matter of discretion but a question of law calling for an application of a rule of law to a particular set of facts. The true meaning of 'discretion,' when applied to the exclusion or admission of testimony from an expert witness, would be the power to make a choice from two or more legally valid solutions if supported by the facts. * * *

"* * * * *

"The decision of the trial judge is legally valid so long as that decision is based on the proper application of a rule of law to the facts involved."

*Id.* at 256-58.

Similarly, in *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999), this court explained that some evidentiary rulings contain both legal and discretionary determinations:

"[W]e must determine the appropriate standard of review for trial court determinations of relevance under OEC 401—a question that previously has not been addressed expressly by this court. In considering that question, we note the distinction between the determination of relevance under OEC 401 and the question of admissibility under OEC 403. A decision to exclude evidence under OEC 403 is reserved to the trial court's discretion. * * * That is so because application of OEC 403 may allow for more than one legally correct outcome. * * * For example, in some cases, the record may support either the admission or exclusion of otherwise admissible evidence under OEC 403, and neither result legally would be incorrect. * * *

"Relevance determinations under OEC 401, by contrast, can yield only one correct answer; evidence either is relevant or it is not. Under OEC 401, if evidence logically is relevant, a trial court has no discretion to label it as irrelevant. * * * Accordingly, we conclude that we must review determinations of relevance for errors of law."

(Citations omitted.) *See also, e.g., State v. Hubbard*, 297 Or 789, 794 n 2, 688 P2d 1311 (1984) (term "discretion" should indicate discretion to make decision from among available choices and should not be buzzword for appellate abdication); *Stringer*, 292 Or at 394 (if answer to question whether expert testimony will assist jury reasonably could be decided either way, then trial court has latitude in admitting evidence).

 From the foregoing, we glean several principles. First, in the context of evidentiary rulings, "discretion," as this court has used that term, refers to the authority of a trial court to choose among several legally correct outcomes. If there is only one legally correct outcome, then "discretion" is an inapplicable concept. It follows that we first must review evidentiary rulings without deference to determine whether proper principles of law were applied correctly. Next, and also without deference, we must determine whether application of those principles leads to only one correct outcome. If there is only one legally correct outcome, and the trial court arrived at that outcome, then it did not err; conversely, if the trial court arrived at a different outcome, then it did err. Only if we determine that application of the correct legal principles leads to more than one correct outcome do we continue to review whether the trial court abused its discretion in choosing an outcome.[8] If the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, then the trial court did not abuse its discretion. Accordingly, appellate review of rulings on the admissibility of evidence may involve the application of several standards of review, depending on the particular ruling and assignment of error at issue.

With those general principles in mind, we turn to the evidentiary ruling at issue, *viz.*, that Blakely was not qualified "by knowledge, skill, experience, training or education"

---

[8] To say that a trial court necessarily abuses its discretion if it applies the wrong principle of law or incorrectly applies the correct rule of law leads to the same result. However, the formulation that we have set out is more straightforward and correctly distinguishes that we do not defer to trial courts' legal determinations. To say that an appellate court should review the legal aspects of an evidentiary ruling for abuse of discretion and that a trial court abuses its discretion if it makes a legal error unnecessarily complicates a simple principle, *i.e.*, that appellate courts review questions of law anew without deference to the decisions of trial courts.

to testify about possible causes of frontal lobe dysfunction. OEC 702.[9] We first determine the proper law to apply to that ruling. We have addressed similar questions in several previous cases.

In *State Highway Com. v. Arnold et al*, 218 Or 43, 60, 341 P2d 1089 (1959), a condemnation action, the plaintiff sought to introduce expert witness testimony about the value of the property. Holbrook, the proposed expert witness, testified about his education and experience, which included substantial appraisal experience and, in particular, experience appraising cinder cones, the type of property at issue. *Id.* at 60-63. The trial court concluded that Holbrook was not qualified as an expert:

> " 'Oh, I don't believe this man is qualified to testify as an expert. He knows nothing of the lands of Klamath County or in this vicinity. The fact he sold a piece of property or he appraised a piece of property for the petroleum company down here in the City of Klamath Falls sometime ago, that certainly isn't qualification. Whatever he knows as to the intricate makeup of these cinders he got from the State of Oregon, it is hearsay evidence as far as he is concerned. He can testify as an ordinary witness but not as an expert.'
>
> " '* * * * *
>
> " 'I don't think he has qualified as a mineral expert any place by this testimony. I don't think he has ever tried to qualify himself as a mineral expert. In this locality he has examined or he has appraised a piece of property for the General Petroleum Company.' "

---

[9] We are not asked, in this case, to review the factual predicates for Blakely's qualification, *e.g.*, whether he in fact was a licensed psychologist. Trial courts determine such facts as preliminary matters under OEC 104(1), and this court reviews the record to determine whether any evidence supports the trial court's ruling. *See* OEC 104(1) Commentary (1981) ("This subsection assigns to the trial judge the responsibility for making certain preliminary determinations regarding qualifications * * *. Is the alleged expert a qualified physician? * * * To the extent that these preliminary inquiries are factual, the judge will necessarily * * * act as a trier of fact."); John Henry Wigmore, II *Evidence in Trials at Common Law* § 561 at 756 (Chadbourn rev 1979) ("[T]he trial court must be left to determine, absolutely and without review, the fact of possession of the required qualification by a particular witness.") (emphasis omitted); *e.g., Highway Com. v. Parker et al*, 225 Or 143, 162-63, 357 P2d 548 (1960) (court has gone far in direction of assigning completely to trial court's discretion ruling on would-be experts' qualifications).

*Id.* at 63-64.

This court "consider[ed] the test for determining whether a witness qualifies as an expert for the purpose of testifying as to the value of property." *Id.* at 64. The court arrived at the following principle to be applied to the determination whether an expert ·is qualified to testify about appraisal: "[T]here is such 'generalized knowledge' [of valuation processes or appraisal methods] and * * * it is to be weighed in determining whether the witness qualifies as an expert." *Id.* at 65. The court then reviewed the evidence of Holbrook's education and experience in light of the particular testimony sought, concluding:

> "We are of the opinion that Mr. Holbrook should have been permitted to testify as an expert and that the trial court's refusal to permit him to do so constitutes reversible error. The trial judge stated that the witness had not 'qualified as a mineral expert.' It was not necessary for him to do so. He was called to give testimony with respect to the value of the condemned property. To establish such value it was not necessary that he have scientific knowledge of the minerals which were being taken."

*Id.* at 64. Similarly, in *Brown et ux v. Eakins*, 220 Or 122, 348 P2d 1116 (1960), the court examined the training and experience of the witness in light of the testimony sought. *See id.* at 124-25 (concluding that "[t]he evidence amply qualifies [the witness] to give an opinion on the cause of fires generally and the cause of this particular fire").

In *Wulff v. Sprouse-Reitz Co., Inc.*, 262 Or 293, 498 P2d 766 (1972), the defendants contended that the trial court had erred by allowing the plaintiffs' expert witness, a chemical engineer, to testify about whether the plaintiffs' electric blanket could have caused a fire. This court stated:

> "We gather from the questions asked Dr. Anderson by defendants' counsel in aid of objecting to his qualifications that at the time of trial they did not feel he was qualified as an expert because he had no specific experience in the manufacture of electric blankets. * * * Defendants' objection to his qualification was:

" 'Well, I would on the basis of the man's testimony now object to his answering the question on what caused this blanket or whatever the problem was with the blanket in glowing and so forth, on the ground I don't think he qualified from the electrical standpoint and I think he so indicated.' "

*Id.* at 304-05. This court reviewed the witness's education and experience and then stated:

"Even though the witness was a chemical engineer and not an electrical engineer, he had sufficient training, study, background, and experience to qualify as an expert witness. He does not necessarily have to be an expert in the specific item under question in a products liability case. Whether he is the best expert witness on the specific subject or what credibility will be given to the witness's testimony are matters that go to the weight of his testimony and not to his qualification."

*Id.* at 305. This court held that the trial court did not err in allowing the witness to testify as an expert. *Id.* at 306. *See also Dyer*, 318 Or at 398-99 (examining expert's qualification to testify about point of impact); *Barrett*, 294 Or at 649 (examining experts' qualification to testify about psychological condition); *Myers*, 275 Or at 519-21 (observing "[n]o expert is competent to express an opinion on every subject"; examining expert's qualification to testify about cause of airplane crash); *Meyer v. Harvey Aluminum*, 263 Or 487, 489, 501 P2d 795 (1972) ("The capacity [to testify] is in every case a relative one, *i.e.*, relative to the topic about which the person is asked to make his statement."; examining expert's qualification to testify about cause of damage to fruit) (internal quotation marks omitted).

Those cases demonstrate that this court reviews without deference for errors of law whether a trial court properly applied OEC 702 to decide whether an expert is qualified to give testimony *relative to a particular topic*, because that determination is a question of the application of law. Once that threshold is satisfied, it is for the factfinder to ascribe the proper weight to an expert's testimony.

In this case, the basis for the trial court's ruling was that, because Blakely lacked a medical degree, he was not qualified to testify about the possible causes of defendant's frontal lobe dysfunction.[10] This court previously has addressed whether a particular degree or field of practice is a necessary prerequisite to testimony about a particular topic.

For example, this court has held that a trial court should not have excluded the testimony of medical doctors about a psychological diagnosis known as functional overlay on the grounds that the witnesses were not psychologists. *Barrett*, 294 Or at 649. Similarly, in *Sandow v. Weyerhaeuser Co.*, 252 Or 377, 449 P2d 426 (1969), this court held that the trial court erred in refusing to admit testimony from a clinical psychologist that the plaintiff's head injury had caused his emotional disturbance on the ground that the witness was not a medical doctor. As this court observed in *Sandow*, "a properly-qualified clinical psychologist is competent to testify concerning a person's mental and emotional condition despite his not having medical training." *Id.* at 384. A medical degree is not a necessary predicate to finding an expert witness qualified to testify about medical knowledge, assuming that witness otherwise is qualified to do so. It follows that, in this case, Blakely's lack of a medical degree similarly should not have been the determinative factor in the decision whether to admit his testimony.

Proper application of OEC 702 requires assessment of the particular qualifications of each witness. We do not assume a disqualification from the lack of a particular educational or professional degree. Accordingly, and similar to our analysis in *Sandow*, 252 Or at 384, if Blakely was "a properly qualified clinical psychologist," then it was error not to permit him to testify about the possible causes of defendant's frontal lobe dysfunction. All that remains is to review Blakely's testimony about his qualifications to determine if he was in fact a "properly qualified clinical psychologist."

---

[10] Although the trial court stated, in making its ruling, that Blakely was unqualified to testify as to "*a* cause" (emphasis added), we observe that defense counsel reiterated that he had sought Blakely's testimony only about the range of possible causes for the type of encephalographic profile presented by defendant.

The record demonstrates that Blakely had special training and knowledge relating to, and thus was qualified to testify about, the possible causes of frontal lobe dysfunction. Blakely testified that he holds a Ph.D. in physiological psychology, has done post-doctoral work in neuroscience, including neuropathology, and has taken advanced workshops including several at Harvard Medical School. He has taught neuroanatomy at the University of California, among other places, and has written a treatise on neuroanatomy. He has worked in the field of electroencephalography for more than 20 years, specializing in electroencephalographic measurement and interpretation, and also performs neuropsychological evaluation. He belongs to several professional organizations, including the International Neuropsychological Association. He has published several papers, including a monograph on the neuropsychological basis of crime, and articles in peer-reviewed journals. Members of his field routinely render interpretive conclusions, and Blakely has rendered opinions and conclusions based on his data in the past, including as part of civil and criminal proceedings. That combination of education and experience demonstrated that Blakely had the requisite knowledge to testify helpfully about the possible causes of defendant's frontal lobe dysfunction. The trial court erred in concluding otherwise.

## CONCLUSION

In summary, we conclude that the trial court erred in refusing to permit the jury to consider the option under ORS 163.150(5)(a) (1993) of sentencing defendant to life in prison without the possibility of parole and to permit defendant to waive an *ex post facto* objection to the jury's consideration of that option. That error requires this court to vacate the sentence of death and to remand the case for further proceedings. We also conclude that the trial court erred in striking the last paragraph from the statement that defendant proposed to convey to the jury. Finally, we conclude that the court erred in determining that Blakely was not qualified to testify about the possible causes of the frontal lobe dysfunction presented by defendant's encephalographic profile.

We have examined defendant's other assignments of error. Those assignments either are not well taken or raise

issues that are unlikely to recur on remand. We decline to address those assignments in greater detail.

The sentence of death is vacated, and the case is remanded to the circuit court for further proceedings.