Argued and submitted June 19, 2001; resubmitted en banc February 6, reversed
and remanded March 20, 2002

In the Matter of
Oscar Garcia, a Minor Child.
STATE ex rel JUVENILE DEPARTMENT
OF MALHEUR COUNTY,
*Respondent,*

*v.*

Oscar GARCIA,
*Appellant.*
5854J; A109595
44 P3d 591

Angela Sherbo argued the cause and filed the brief for appellant.

Christina M. Hutchins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

EDMONDS, J.

Brewer, J., concurring.

Kistler, J., dissenting.

Schuman, J., not participating.

**EDMONDS, J.**

Youth was initially placed in the legal custody of Oregon Youth Authority (OYA) on August 12, 1999, after having been found to be within the jurisdiction of the court for having committed what would have been a criminal offense, had he been an adult. ORS 419C.478. On February 15, 2000, youth was placed in a youth correctional facility pursuant to ORS 419C.495(1). He appeals from the placement order, and we reverse.

The hearing that youth challenges occurred after youth was terminated from the Parrot Creek Residential treatment program on February 7, 2000. On February 9, representatives of OYA undertook to remove youth from the treatment facility. Youth resisted. Armed with a knife, he threatened to harm himself and the staff. After he was subdued, he was taken to a nearby hospital for a mental health evaluation and was hospitalized for five days. When he was released, OYA intended to transport him to a detention facility in Pendleton, pending a hearing in Malheur County. While *en route*, youth again acted out of control and was lodged in a detention facility in The Dalles. On the afternoon of February 14, 2000, the juvenile court convened a hearing by telephone. Youth was in The Dalles, and his appointed counsel was in Vale. At the request of youth's appointed counsel, the court continued the hearing until the next morning.

The following day, youth's counsel told the court:

"As far as what I would like to see is I would like to see a continuance to give him more time to do this as far as the record. I was informed of this case at three o'clock (3:00) yesterday afternoon. Court was at four o'clock (4:00). I received the discovery at approximately ten to four with very little time to review it, but from my review, it looks like a—somewhat of a suicide attempt by my client, and I think he needs a mental evaluation. I received what the State has given you, and much of this is illegible. And I think an evaluation needs to be done to see if he can aid and assist at this time, and in the future time. And I think if we

don't have that evaluation, it's a denial of effective assistance of Counsel under the Oregon and Federal Constitutions. We also need to determine if—if that mental evaluation will see if he can conform his conduct to the requirements of the law.

"I would also argue that it's a denial of due process that the—that this hearing is so fast. And I have some exhibits that I'd like to make on that behalf. This is 101. This is the mental evaluation that I received. 102 is a document from Parrot Creek, which I received approximately five (5) or ten (10) minutes ago. 103 is an incident report which was faxed to the Juvenile Department, and I received it within the last ten (10) or fifteen (15) minutes. And then 104, the reports from OYA. I would note that those were—those were faxed to OYA on February 10th, and then they were provided to me yesterday at—just before four o'clock (4:00)."

The court denied youth's motion for a set-over. The court explained its ruling:

"As to the request for a continuance, I'm going to deny the request for a continuance. As indicated, this is not an initial adjudication. [Youth] has already been adjudicated. This is simply a review hearing to determine the next placement for [youth]. His psychological status has been reviewed. It's clear that there—there are no other alternatives available to [youth]. Primarily because of [youth]'s behavior, he has made it impossible to place him anywhere other than in the juvenile institution. So I am going to order, [youth], that—that you be placed in the—the—in a juvenile correctional facility. The actual placement I'll leave to Oregon Youth Authority."

Youth makes five assignments of error on appeal, including the assertion that the juvenile court erred "in denying the child's motion for a reasonable period to enable court-appointed counsel time to prepare the case." He argues, in part:

"The proceeding at which [youth] was ordered placed in a youth correct[i]on facility for 22 years or until his 25th birthday (11½ years) was fundamentally unfair and violated [youth]'s rights under the Fourteenth Amendment to the United States Constitution. The hearing took place only hours after [youth] had been released from a psychiatric

hospital where he had spent 5 days after a 45-minute stand-off with fourteen armed law enforcement agents whom [youth] had asked to shoot him. [Youth] participated in the hearing by telephone from a detention facility and his counsel had been appointed only one hour before the hearing convened and received the discovery 10 minutes before it began. No witness testified under oath and all of the information the court received was second or third-hand. The substantive portion of the hearing lasted only a few minutes."

The state counters that many of the due process issues that youth raises on appeal were not preserved below as required by ORAP 5.45[1] and that counsel's reference to due process in summary fashion was insufficient to put the juvenile court on notice regarding the issues that youth raises on appeal. It concedes that youth's counsel argued to the juvenile court that he did not have time to prepare for the commitment hearing.

The first issue is whether youth's appeal is moot. During the pendency of the appeal, youth was released from the youth correctional facility and returned to a residential treatment program. Then, he was returned to the youth correctional facility from that treatment program. Since that time, he has been placed in another residential treatment program. Given those developments, the state argues that we need not reach the merits of youth's argument on appeal because he is no longer in a youth correctional facility.

██ ██    Whether a case no longer has justiciable issues so that it will be dismissed as moot depends, in part, on whether the court's decision can have a practical effect on the rights of the parties. *Brumnett v. PSRB,* 315 Or 402, 848 P2d 1194 (1993). In *Brumnett,* the petitioner was committed to the jurisdiction of the Psychiatric Security Review Board (PSRB) and later sought release on the ground that, at that time, he did not suffer from a mental disease or defect. While judicial

---

[1] ORAP 5.45(4)(a) provides, in part:

"Each assignment of error shall demonstrate that the question or issue presented by the assignment of error timely and properly was raised and preserved in the lower court."

review was pending, he was released from PSRB's jurisdiction unconditionally. The state moved to dismiss the case as moot because of the unconditional release. The petitioner argued that the case was not moot because he was still subject to a statutory obligation to pay the cost of his care incurred while under PSRB's jurisdiction. The court agreed with the state's argument:

> "Petitioner is not presently the subject of any order of the state to pay any of the cost of his care and consequently is not presently subject to any lien. The mere possibility that the state might seek such an order at some future date is not sufficient to make dismissal inappropriate. The state has not said that it intends to seek any reimbursement from petitioner. Rather, one representative of the state has asserted only that it *might* do so sometime in the future. The moving party has carried his burden to establish that the case is moot." *Brumnett*, 315 Or at 407 (emphasis in original).

In *Barnes v. Thompson,* 159 Or App 383, 977 P2d 431, *rev den* 329 Or 447 (1999), we followed the court's holding in *Brumnett*." The plaintiff in *Barnes* petitioned for habeas corpus relief, alleging that, as a result of the Parole Board's ruling, his parole release date had been impermissibly extended. During the pendency of the appeal, the plaintiff was released on parole. The state argued that his appeal was moot because of his release. He responded that, had he been released earlier, he may have been eligible for an earlier transition from active to inactive supervision while on parole. We held that the mere possibility that the Board may have changed the plaintiff's status from active to inactive at an earlier time was so speculative in nature that it did not save the case from mootness. We pointed out that it was left to the discretion of the Board, based on how the plaintiff had done on active supervision, as to when, if ever he would be transferred to inactive status.

The facts in this case make it qualitatively different from the facts in *Brumnett* and *Barnes.* Unlike the appellants in those cases, who were no longer in custody when they appealed, youth is still in the custody of OYA and is subject to an existing and continuing statutory consequence as the

result of the commitment order that he challenges.[2] That effect comes from the interplay between ORS 419C.495(1) and OAR 416-300-0050.[3] ORS 419C.495(1) provides:

> "A youth offender placed in the legal custody of the Oregon Youth Authority may be placed in a youth correction facility or in a private institution operated as a facility for youth offenders requiring secure custody *only when the juvenile court having jurisdiction so recommends."* (Emphasis added.)

Under the statute, an adjudicated youth as to whom the court has not yet recommended placement in a correctional facility is entitled to court review of such a placement before it occurs. For youth offenders who have been previously placed in a youth correctional facility, however, the right to a *court* recommendation before again being placed in a correctional facility is lost. That is because, after an initial commitment to a youth correctional facility and release on parole, OYA has the authority under ORS 419C.495(1) and OAR 416-300-0050 *et seq.* to revoke a youth offender's parole status and

---

[2] This case is similar to *Barnes* in one respect. Youth remains and Barnes remained under the supervisory authority of the state after the events that purported to moot the controversies. However, the consequence to Barnes was the possibility of a delay in his transfer from active to inactive parole, a consequence that was so speculative that we deemed it not to be of "practical effect." In contrast, if youth's parole is revoked, the potential consequence to youth is incarceration.

[3] The administrative process for revocation of parole status provides for a preliminary hearing when it is alleged that a youth is in violation of his or her parole. OAR 416-300-0060. At the preliminary hearing, a hearing officer determines if there is probable cause to believe that a violation has occurred. Unlike in a juvenile court hearing, the decision whether to provide counsel to an indigent youth at the state's expense is at the discretion of OYA and is dependent on OYA deciding that the "circumstances suggest that counsel is necessary to protect the rights of the youth." The hearing officer reports his or her findings to the superintendent or the superintendent's designee, who decides whether the youth is an appropriate candidate for revocation. If a revocation hearing is to be held, the youth is returned to the youth care facility. The revocation hearing is held before a committee of three youth correctional facility persons, who determine whether a violation has occurred. OAR 416-300-0100. If the youth has been charged with a law violation that is to be "adjudicated in judicial court, revocation hearing procedures shall be suspended pending the outcome of the court hearing. The youth may request a revocation hearing after the court hearing, if he/she so chooses." OAR 416.300-0100(1). "The youth has a right to consult with an attorney *at the youth's own expense* before deciding whether or not to waive the revocation hearing." OAR 416-300-0070(2)(c) (emphasis added).

return the youth to a secure facility without the court's recommendation and without a court finding that the youth has committed additional criminal offenses. In this case, youth's present placement in a residential treatment program is subject to OYA's authority to return him to a youth correctional facility without the juvenile court's recommendation.

By its terms, ORS 419C.495(1) embodies a legislative policy decision that Oregon juveniles will not be placed initially in youth correctional facilities without the affirmative recommendation of the juvenile court. The exception to that policy is when there has been a previous recommendation for such placement in the same case. Because of that policy, youth's challenge to the proceeding that resulted in his placement in a youth correctional facility is not moot merely because he has now been released from that placement; rather, the proceeding deprived him of an important statutory right that he would otherwise have, and it resulted in a condition of parole that would not exist but for the commitment. In other words, the loss of the statutory entitlement to a judicial hearing and an affirmative recommendation by a juvenile court judge are implicit terms of his parole because of the effect of the commitment order. Youth's existing parole status is in sharp contrast to the plaintiff in *Barnes*, who had been released on parole, and to the petitioner in *Brumnett*, who had been released from PSRB's jurisdiction. As a consequence of those facts, they could only point to the speculative possibility of potential consequences in the future. Because youth is now subject to again being placed in a youth correctional facility without the recommendation of the committing juvenile court, we hold that the "practical effect" requirement of *Brumnett* and *Barnes* has been met. Consequently, we turn to the merits of youth's appeal.

Our standard of review of the court's denial of youth's motion for a set-over is for an abuse of discretion. *State v. Arnold*, 90 Or App 596, 599, 752 P2d 1300, *rev den* 306 Or 661 (1988). An abuse of discretion occurs when a court acts beyond the boundaries established by law. *State v. Rogers,* 330 Or 282, 312, 4 P3d 1261 (2000) ("If the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, the trial court did not abuse its discretion."). One of

the boundaries established by law is that counsel must be given a reasonable amount of time to prepare for a hearing that could result in the deprivation of a liberty interest.

> "The essence of fundamental fairness is the opportunity to be heard at a meaningful time and in a meaningful manner. *See generally Mathews v. Eldridge*, 424 US 319, 333, 96 S Ct 893, 901, 47 L Ed 2d 18 (1976). Fundamental fairness emphasizes factfinding procedures. The requirements of notice, adequate counsel, confrontation, cross-examination, and standards of proof flow from this emphasis. *McKeiver v. Pennsylvania, supra*, 403 US [528, 543, 91 S Ct 1976, 29 L Ed 2d 647 (1985)]. Fundamental fairness is flexible and calls for such procedural protections as the particular situation demands." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189-90, 796 P2d 1193 (1990).

As to the denial of a motion for a set-over,

> " '[t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel * * * *Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality* * * *. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. * * *' " *State v. Reese*, 25 Or App 231, 234, 548 P2d 998 (1976) (quoting *Ungar v. Sarafite*, 376 US 575, 589, 84 S Ct 841, 11 L Ed 2d 921 (1964)) (emphasis added).

Here, counsel was not aware of the case until the afternoon before the hearing. He had obtained some of the exhibits that were being offered against his client only five to ten minutes before the hearing, and some of those were illegible. Counsel told the court that he was unable to conduct any investigation on his own and that he was not able to ascertain whether there were additional documents available that he had not been given. He had not yet met with his client face-to-face because they were in different cities, and he told the court that, based on the information that he did have, he had concerns about youth's mental status. Youth's mental status

could implicate his ability to aid and assist counsel as well as his ability to conform his conduct to the requirements of the law. Moreover, counsel and the court were aware of youth's attempted suicide. It may be, as the court ruled, that there was no other disposition available except commitment to a youth correctional facility in light of the mental evaluation that had already been done. Nonetheless, youth was entitled through his counsel to a reasonable opportunity to explore alternatives and to obtain evidence to support those alternatives before the court exercised its discretion under ORS 419C.495(1). For the above reasons, the juvenile court abused its discretion when it denied youth's motion for a set-over.

Reversed and remanded.

**BREWER, J.,** concurring.

I concur in the result reached by the majority but take a somewhat different path to the conclusion that youth's appeal is not moot.

As the dissent points out, if youth's only objective was release from secure confinement in a youth correctional facility, he has—at least for now—obtained that result by virtue of his return to a treatment placement. If youth's objective is so characterized, it is difficult to quarrel with the dissent's view that the appeal is moot. *See, e.g., Barnes v. Thompson,* 159 Or App 383, 386, 977 P2d 431, *rev den* 329 Or 447 (1999). However, youth's request is not so limited. He also is concerned with the effect of the challenged order on his status while he remains subject to the risk that he may be returned to a correctional facility. That adverse effect on his status precludes the conclusion that youth's appeal is moot.

To explain why, it is useful to analogize youth's predicament to that of a convicted adult offender. In the criminal justice system, mootness by reason of release from custody generally occurs in the following circumstances: (1) in the case of a pre-guidelines indeterminate sentence, if the offender has completed his or her prison sentence and has been discharged from parole or otherwise is not subject to the risk of parole revocation, *see, e.g., State v. Chase,* 120 Or App

523, 525, 851 P2d 637 (1993); (2) also in the case of an indeterminate sentence, if the offender remains subject to the possibility of parole revocation but has challenged only the *date* of his release from prison, not the court's authority to imprison him in the first place or the proper date of parole expiration, *see, e.g., Barnes*, 159 Or App at 386; or (3) in the case of a guidelines sentence, the offender cannot be revoked because his period of post-prison supervision has expired and, thus, the sentence is discharged. *Baty v. Slater*, 161 Or App 653, 656-57, 984 P2d 342 (1999), *adhered to on recons* 164 Or App 779, 984 P2d 342, *rev den* 331 Or 191 (2000). In other cases, an appeal from an erroneous decision is not made moot by virtue of the offender's release from confinement, if he or she remains subject to the type of collateral consequence that creates a cognizable practical effect. *Brumnett v. PSRB*, 315 Or 402, 405-06, 848 P2d 1194 (1993); *Barnes*, 159 Or App at 386.

Here, youth originally was placed on probation and, incidentally, placed in a treatment facility. He was then, in effect, "revoked" from probation by the juvenile court and ordered to be confined in a youth correctional facility. Now, he has been "paroled" from the young correctional facility and has been returned to a residential treatment placement. On the merits of his appeal, youth challenges the authority of the juvenile court, in the first instance, to order his confinement in a youth correctional facility. His appeal is not moot, because his *status as a parolee* subjects him to the possibility of a higher level of custody in a correctional facility should his parole again be revoked.

If the juvenile court's order is upheld, youth will lose the valuable right to a court recommendation before he can be returned to a youth correctional facility. *See State ex rel Juv. Dept. v. Anzaldua*, 109 Or App 617, 619-20, 820 P2d 869 (1991) (holding that commitment to a youth correctional facility "will affect the child's liberty interest as much as an adjudicatory hearing"). That *type* and *probability* of a collateral consequence is sufficient, despite youth's present release to a treatment facility, to preserve a practical effect of the order.

*Barnes* is not to the contrary. There, the plaintiff challenged only the Board of Parole's determination of his release date. Because he identified no other collateral consequence of the Board's decision, his appeal became moot when he was released. 159 Or App at 386. We went beyond the plaintiff's arguments to speculate about the existence of any cognizable collateral consequence and *sua sponte* rejected the possibility of instructing the Board to place the plaintiff on inactive supervision status at an earlier date. *Id.* at 387. We reached that conclusion because we believed that the Board had *discretion* as to whether and when to effect a change in supervision status. Although our understanding about the existence of Board discretion may have been erroneous,[1] *Barnes* has nothing to do with the circumstances here. As noted, youth here is not challenging merely the designation of his release date; instead, he appeals from the underlying order revoking his probation. That revocation has, despite his subsequent return to treatment, caused a status change that will follow him throughout his remaining parole period, indeed throughout the remainder of his juvenile disposition.

Nor does the fact that youth largely controls the risk that his conduct will result in further revocation proceedings furnish a basis for concluding that the juvenile court's order has no practical effect. Again, cases involving adult offenders provide a useful analogy. For example, in *State v. Meyer*, 12 Or App 486, 507 P2d 824 (1973), this court held that a judgment that erroneously failed to merge certain convictions was not moot merely because the defendant remained incarcerated on a separate valid judgment of conviction. The court reasoned:

> "Whether defendant stands convicted of one or two felonies can have a variety of collateral consequences for him; for example in those states that do have habitual criminal laws. As we said in *State v. Farr*, [8 Or App 78, 82 n 1, 492 P2d 305 (1971)]:

---

[1] As noted in *Odle v. Thompson*, 174 Or App 506, 510 n 2, 26 P3d 177 (2001), the plaintiff in *Barnes* did not rely on ORS 144.085, and we did not discuss it. That statute may significantly limit the Board's discretion to defer a change to inactive supervision for offenders who have been convicted of most felony offenses. *See* ORS 144.085(2).

" '* * * The error substantially affects defendant's status by placing one felony conviction against him which should not exist.' " *Id.* at 493.

Of course youth, like the defendant in *Meyer*, ultimately has the choice whether to engage in conduct that might expose him to further confinement. Nonetheless, his appeal is not moot for that reason.

Because I also agree with the majority's conclusion that the trial court erred in denying youth's request for a set-over of the commitment hearing, I concur.

Linder, J., joins in this concurrence.

**KISTLER, J.,** dissenting.

On appeal, youth argues that the trial court erred in transferring him from a residential treatment facility to a youth correctional facility. Because youth was returned to a residential treatment facility after he filed his appeal, the issue that he has raised on appeal is moot. The lead opinion would hold, however, that collateral consequences keep this case alive. It reasons that, as a result of youth's having once been placed in a youth correctional facility, any future determination as to whether he should be returned to that facility will be made administratively rather than judicially. That possibility is, in the lead opinion's view, sufficient to keep this case alive. We do not know, however, whether youth will, in the future, act in such a way that anyone will recommend that he be returned to the youth correctional facility. Because the possibility that the collateral consequence that the lead opinion envisions will ever come to pass is speculative, I would dismiss this appeal as moot.

On August 12, 1999, the trial court placed youth in the legal custody of the Oregon Youth Authority (OYA) for a period not to exceed 22 years or until youth reached the age of 25. The court ordered that the commitment be served in a program other than a youth correctional facility. Pursuant to that order, youth was placed in a residential treatment program at Parrot Creek. While there, youth suffered significant behavioral difficulties, and the decision was made to transfer him to a more appropriate facility. Upon learning that he was going to be transferred, youth became violent. He threatened

to hurt others and to take his own life. After the police arrived, youth surrendered and was taken into custody.

Youth spent a brief time in a hospital before he was transferred to a detention facility in Pendleton. While he was being transferred, youth acted out in a way that led to the February 15, 2000, hearing that gives rise to this appeal. At that hearing, the trial court ordered that youth be placed in a youth correctional facility. Youth then filed this appeal from the February 2000 order.

While this appeal was pending, youth was returned to a residential treatment center. Youth, however, could not remain at that center "because * * * youth's half-brother had just been placed there." He accordingly was returned to the youth correctional facility with the expectation that he would be "placed somewhere outside the youth correctional facility within 60 days." The state has informed us that youth has since been placed in another residential treatment center. Given those developments, the state argues, and I would hold, that youth's appeal is moot.

In analyzing that question, it is important to clarify what is and is not at issue. The trial court placed youth in the legal custody of OYA approximately six months before the February 2000 hearing that youth challenges on appeal. *See* ORS 419C.478(1). The outcome of this appeal thus will have no effect on whether youth remains in OYA's custody. Rather, the most that youth can achieve as a result of this appeal would be a determination, on remand, that he should not be transferred to a youth correctional facility but instead should remain in a residential treatment center. However, because youth has already been returned to a residential treatment center, his appeal is moot unless there are sufficient collateral consequences flowing from the February 2000 hearing to keep the appeal alive. *See Barnes v. Thompson,* 159 Or App 383, 386, 977 P2d 431, *rev den* 329 Or 447 (1999) ("Even if the main issue in a controversy has been resolved, collateral consequences *may* prevent the controversy from being moot under some circumstances.") (emphasis in original).

Youth identifies one potential collateral consequence. He argues that, if he had never been placed in the

youth correctional facility, he could be transferred to such a facility "only when the juvenile court having jurisdiction so recommends." ORS 419C.495(1).[1] Youth reasons that, because he has been placed in a youth correctional facility, he may now be returned there by means of an administrative rather than a judicial hearing. *See* OAR 416-300-0030; OAR 416-300-0100. Youth does not argue that the substantive standard that a court would employ in recommending that he be placed in a youth correctional facility differs from the substantive standard that OYA would employ in recommending that he be returned to a youth correctional facility,[2] nor does he argue that the administrative proceeding would not provide him with all the protections that due process requires. Rather, youth's argument turns solely on the proposition that "an appellate decision favorable to * * * youth would mean that before he could again be placed in a youth correctional facility there would have to be a judicial, not [an] administrative, proceeding."[3]

---

[1] ORS 419C.495(1) provides:

"A youth offender placed in the legal custody of the Oregon Youth Authority may be placed in a youth correction facility or in a private institution operated as a facility for youth offenders requiring secure custody only when the juvenile court having jurisdiction so recommends."

[2] As noted, ORS 419C.495(1) provides that a youth offender may be placed in a youth correctional facility "only when the juvenile court having jurisdiction so recommends." Once a youth has been paroled from a youth correctional facility, the youth may be returned to the facility if he or she either violates the terms of parole or "if in the opinion of the superintendent [of the youth correctional facility] the youth's health or welfare or the best interest of the community requires the youth's return." OAR 416-300-0030(1); OAR 416-300-0020(1)(e). The statute does not specify the criteria that a court may consider in recommending that a youth be placed in a youth correctional facility, and youth does not argue that those unspecified criteria differ from the criteria set out in OAR 416-300-0030 and OAR 416-300-0020 for returning him to the facility.

[3] The concurring opinion would hold that youth's "appeal is not moot, because his *status as a parolee* subjects him to the possibility of a higher level of custody in a correctional facility should his parole again be revoked." 180 Or App at 289 (Brewer, J., concurring) (emphasis in original). In this case, however, youth does not argue that the conditions of his parole differ from the conditions of his probation. A violation of either could result in his being placed in a youth correctional facility, and youth does not contend that the standard to be employed in determining whether he should be placed initially in a youth correctional facility for violating a condition of probation differs from the standard to be employed in determining whether he should be returned there for violating a condition of parole. On the facts of this case, youth's present status as a parolee is for all practical purposes no different from his status before the hearing.

Even if a judicial proceeding might provide some advantage to youth that an administrative hearing would not, the difficulty with youth's argument is that we do not know whether youth will, in the future, act in such a way that anyone will recommend that he be returned to the youth correctional facility. Put another way, we cannot know whether youth will be subject in the future to an administrative hearing to determine whether he should be returned to a youth correctional facility. The single collateral consequence that youth invokes here is no different from the collateral consequence that the court found insufficient in *Brumnett v. PSRB*, 315 Or 402, 848 P2d 1194 (1993).

In *Brumnett*, the petitioner challenged his commitment to the Psychiatric Security Review Board (PSRB). Although the petitioner had been released from PSRB's jurisdiction while his action was pending, he claimed that his action was not moot because he was still subject to collateral consequences flowing from the PSRB commitment. He reasoned that the state could seek to recoup the costs of his confinement pursuant to a statute making people within PSRB's jurisdiction " 'liable for the full cost of their care' " depending on their ability to pay. 315 Or at 406 (quoting OAR 309-012-0030(1)). The court held, however, that the "mere possibility" that the state would seek to recoup the costs of the petitioner's care did not prevent the case from becoming moot on his release. *Id.* at 407.

In *Barnes*, we explained the rationale underlying *Brumnett's* holding. *See* 159 Or App at 387. We observed that "the court [in *Brumnett*] could not know if there would be a 'waiver of collection' of any amount the petitioner was liable to pay pursuant to the statute[.]" *Id.* We also observed that the court "did not speculate on how 'probable' it was that the state would seek to recoup its costs at some point." *Id.*

---

The only possible difference between youth's past and present status is the prospect that, if he should violate the conditions of his parole in the future, he will receive an administrative rather than a judicial hearing to determine the appropriate placement. On that point, the concurrence would weigh the *"type* and *probability"* of the collateral consequence's occurring and hold that this case is not moot. *Id.* (emphasis in original). I am not aware of any case, and the concurrence cites none, in which we have held that the question of mootness turns on the importance of a collateral consequence, discounted by its probability.

Instead, as we explained in *Barnes*, the *Brumnett* court held that, in light of that uncertainty, committing the petitioner to PSRB did not have a sufficient continuing practical effect on him to keep his case alive. *See id.*

Similarly, in *Barnes*, we held that the claimed collateral consequence in that case—that the Board of Parole might have changed Barnes's parole status in that case from active to inactive supervision if he had been released earlier, as he claimed he should have been—was not sufficient to keep his case alive. *Id.* We reasoned: "[W]e can not know if there would be a change from active to inactive supervision, given that the Board has discretion to determine whether a person will be changed to inactive supervision." *Id.*; *see also Odle v. Thompson*, 174 Or App 506, 510, 26 P3d 177 (2001); *State v. Dick*, 169 Or App 649, 10 P3d 315 (2000). Conversely, collateral consequences are sufficient to keep a case alive when those consequences do "not result from the exercise of Board discretion but, instead, *follo[w] automatically* from the revocation of parole." *Perdue v. Board of Parole*, 165 Or App 751, 754, 997 P2d 277 (2000) (emphasis added); *see Odle*, 174 Or App at 510-11 (distinguishing *Barnes* and *Perdue*).

Applying the principle announced in *Brumnett* and explained in *Barnes*, I would hold that youth's appeal is moot. Unlike *Perdue*, the one collateral consequence that youth identifies in this case does not "follow automatically" from his transfer to a youth correctional facility. *See Perdue*, 165 Or App at 754. Rather, youth will be subject to an administrative proceeding to determine if he should be returned to the correctional facility only if, at some point in the future, he either violates the conditions of his parole or if "youth's health or welfare or the best interest of the community requires [his] return." OAR 416-300-0030; OAR 416-300-0020(1)(e). We cannot know whether either of those conditions will occur. The possibility that they may do so is as speculative as the collateral consequences the petitioner invoked in *Barnes* and also in *Dick*.[4] *See Dick*, 169 Or App at 650; *Barnes*, 159 Or App at 387.

---

[4] The defendant in *Dick* appealed from an order revoking his probation and returning him to custody. Even though the defendant had completed his sentence by the time his appeal was decided, the defendant argued that the appeal was not moot

Indeed, the question whether youth will be subject to administrative proceedings to return him to a youth correctional facility turns on how he chooses to conduct himself in the future. Unlike the petitioner in *Brumnett*, who had no control over whether the state would seek to recoup the costs of his custody, youth retains the ability to avoid the single collateral consequence that he has identified here. *Cf. O'Shea v. Littleton*, 414 US 488, 496-97, 94 S Ct 669, 38 L Ed 2d 674 (1974).[5] The possibility that youth may be subject to that collateral consequence in the future is not sufficient to keep his appeal alive. I would dismiss it as moot.

Deits, C. J., and Landau and Haselton, JJ., join in this dissent.

---

" 'because defendant's "prior violation history" may be considered by a court in deciding what sentence to impose should defendant have future legal problems. Accordingly, defendant faces continuing collateral consequences as the result of the illegal revocation of his probation in this case.' "

169 Or App at 650 (quoting the defendant's argument). We dismissed that argument, reasoning that "the mere possibility of future adverse consequences does not render a case justiciable." *Id.* In my view, the same reasoning applies equally here.

[5] In *O'Shea*, the plaintiffs alleged that the defendants were administering the criminal laws unequally. In ruling that their claims were speculative, the Court noted that the plaintiffs faced no pending charges. 414 US at 496. It then observed: "We assume that [the plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by [the defendants]." *Id.* at 497.